# Exhibit D

January 22, 2025

**VIA ECF**

The Honorable Craig T. Goldblatt
United States Bankruptcy Court
District of Delaware
824 North Market Street, 3rd Floor
Wilmington, DE 19801

RE:    ***George L. Miller, Chapter 7 Trustee v. Todd S. Nelson, et al.*; D. Del. Bankr. Adv. No. 20-50627 (CTG)**

Dear Judge Goldblatt:

I write jointly on behalf of George L. Miller, Chapter 7 Trustee (the "Trustee") and Defendants (collectively, the "Parties") to update the Court on the status of the above-referenced adversary proceeding since our last joint status report on December 10, 2024.

As the Court will recall, the Parties' Rule 26(f) conference, issuance of a scheduling order, and commencement of formal discovery have been held in abeyance while the parties worked collaboratively to retrieve voluminous EDMC data stored on the server of the Receiver for the Dream Center Foundation ("DCF")—which had been transferred by the Debtors prepetition as part of the sale to DCF.

The mediation scheduled for December 4, 2024 was cancelled as a result of a dispute between the Parties concerning its scope. The Trustee advised that, based upon the information obtained from the Receiver, he intends to pursue allegations that certain Defendants should be held liable for breach of fiduciary duty and the return of compensation for allegedly torpedoing/forgoing the sale of certain of the Debtors' assets (i.e., the Argosy University and South University education systems) for $150 million or more in favor of a sale of all of the Debtors' assets (including the Art Institutes) to DCF for what the Trustee contends was less than zero consideration. The Trustee contends that these Defendants, in conjunction with third parties who are not defendants, were motivated by conflicted loyalties and personal gain.

The Defendants opposed mediation that included the Trustee's sale-related allegations and maintain that the Trustee's Second Amended Complaint (the "SAC") does not include any allegations or causes of action encompassing these sale-related allegations, and that the sale-related allegations constitute new claims with respect to which the Trustee must seek leave to file an amended complaint. The Trustee maintains that he is not asserting any new claims; rather, he is asserting additional facts in support of his existing claims in the SAC and thus is not required to file a motion for leave to amend under Rule 15.

The Parties' conducted a Rule 26(f) conference on January 3, 2025, but were unable to agree upon a scheduling order given the dispute as to whether an amended complaint is necessary to include the sale-related facts within the scope of the Trustee's claims.

The Honorable Craig T. Goldblatt
January 22, 2025
Page 2

The Parties request a scheduling conference with the Court and briefly set forth their positions below.

### **The Trustee's Position**

On December 18, 2024, the Trustee served his Initial Disclosures. He requests the issuance of a scheduling order and the commencement of formal discovery.

As to the facts underlying the sale-related allegations of which Defendants complain, they merely restate the existing claims with greater particularity and amplify the factual circumstances surrounding the transactions and occurrences described in the SAC, including those with respect to the wind down and sale of the Debtors' businesses upon which the challenged bonuses— referred to in the SAC as the "Excessive Payments"—are based. *See Bensel v. Allied Pilots Assoc., et al.*, 387 F.3d 298 (3d Cir. 2004).

Simply stated, the allegations of the SAC encompass and place Defendants on fair notice that the wind down and sale of the Debtors' businesses, along with the bonuses paid to Defendants in connection therewith, are within the scope of the Trustee's claims.

For example, the SAC alleges:

- This adversary proceeding arises from the demise of the EDMC Companies, a conglomerate of one of the largest for-profit providers of secondary education in the world, whose exponential growth was fueled by private equity investors that implemented illegal recruiting and compensation schemes to pump up growth and tap federal student loan funds. SAC, ¶ 2.

- … certain of the Defendants abused their positions of trust, lined their pockets and looted the EDMC Companies of more than $20 million while the EDMC Companies sold off parts of their business for pennies on the dollar and spiraled out of existence. SAC, ¶ 4.

- In light of the ongoing illegal scheme perpetrated by Defendants, the statements made in each EDMC school's PPA and as part of the annual audit process were fraudulent misrepresentations. This fraud was ongoing and continued until shortly before or to the Petition Date, concealing the true nature of Defendants' behavior while assuring Debtors, shareholders, creditors, the government and students that the EDMC Companies were complying with federal regulations. SAC, ¶ 90.

- In January 2016, Debtors began a "teach-out" (i.e., they accepted no new students) of lower-performing locations. These included 19 out of the 51 Art Institutes, 22 of the 26 Brown Mackie Colleges and one Argosy College.

- The Company spent significant sums to "teach-out" these schools, with the final school teach-outs completed in December 2017.

The Honorable Craig T. Goldblatt
January 22, 2025
Page 3

- In June 2016, EDMC announced the closure of most of the Brown-Mackie Colleges.

- EDMC engaged an investment advisor to pursue the sale of the school locations that were not being taught-out. Ultimately, EDMC consummated several transactions as it sold off what remained.

- In June 2016, EDMC II LLC sold The Connecting Link II, LLC to Triad Learning Systems, LLC and Taylor Study Method, LLC for $1.7 million.

- In January 2017, Debtors sold assets associated with the Brown Mackie College campuses located in Bettendorf, Iowa, Hopkinsville, Kentucky, and North Canton, Ohio to Ross Education, LLC ("Ross Education"). The Debtors' business and assets were in such poor financial shape at the time that Debtors actually had to *pay* Ross Education $2.1 million in connection with the sale.

- On January 18, 2017, EDMC and certain of its subsidiaries entered into an Asset Purchase Agreement (the "DCF Purchase Agreement") with Dream Center Foundation ("DCF"), a not for profit entity, and certain of its newly formed subsidiaries (collectively with DCF, the "DCF Buyers") for the sale of substantially all of the Company's remaining school locations, specifically South University, Argosy University (including one campus being taught-out), and all of the "core" Art Institutes school locations (other than The Art Institute of Vancouver) which were not being taught-out. The DCF Purchase Agreement was amended and restated on February 24, 2017 and further amended on July 20, 2017 and October 13, 2017. Under the final terms of the DCF Purchase Agreement: (a) There were two closing dates due to a delay in the receipt of regulatory approvals for institutions accredited by The Higher Learning Commission (four locations) and Middle States Commission on Higher Education (two locations including the fully online programs offered by The Art Institute of Pittsburgh), with the first closing occurring on October 17, 2017 and the second closing occurring on January 19, 2018.

- In January 2017, pursuant to a Transition Services Agreement executed in connection with the DCF transaction, the DCF Buyers took possession and control of substantially all of the Company's and its affiliates' books and records and agreed to provide certain administrative services to the Company and its affiliates as they wound down business affairs.

- … Defendants' unlawful behavior continued through the sale of the Debtors' businesses. The unlawful behavior was part of a course of conduct that continued unabated through and beyond the time of the 2015 Settlements. …

The Honorable Craig T. Goldblatt
January 22, 2025
Page 4

SAC, ¶¶ 123-131.

- There were numerous so-called "red flags" that should have alerted the Defendants as to the EDMC Companies' illegal recruiting practices and other unlawful conduct, including:

\*\*\*

m.  In June 2017, as EDMC prepared to sell off its remaining schools to the Dream Center Foundation (DCF), members of Congress again expressed concerns with the continuing pattern and practice of behavior at EDMC.  On June 22, 2017, Senators Dick Durbin, Elizabeth Warren, Sherrod Brown and Kamala Harris, along with Congresswoman Rosa DeLauro of Connecticut, called for close scrutiny of EDMC's proposed sale to DCF.  These members of Congress sent letters to several university accrediting commissions which noted that earlier in 2017, "a staggering number of EDMC programs were revealed to be saddling their students with stunning levels of student debt and producing graduates at poverty-level wages."  It noted that "EDMC had the highest number of programs that failed the guidelines" of the federal gainful employment regulations.  More than 70% of EDMC schools were failing or in the "warning" zone on these regulations.  Thus, these members of Congress expressed "deep concern" that EDMC was **still** maintaining "a predatory operating and recruitment model" in violation of federal law.

n.  These members of Congress were also concerned that EDMC was still engaging in "a pattern of spending more on marketing and recruitment than on instruction, and a financial arrangement that allows institution leaders to personally profit from the institution's operations."

o.  EDMC continued to be the subject of state AG investigations even after the 2015 consent judgments.  In 2018, the Massachusetts attorney general filed a lawsuit against the New England Institute of Art, an EDMC school, alleging that EDMC misled prospective students about the programs offered in order to get them to enroll.

SAC, ¶ 133.

Similarly, this Court's initial opinion on Defendants' motions to dismiss observes that the wind down and sale of Debtors' businesses, along with the bonuses paid to Defendants in connection therewith, fall within the scope of the Trustees breach of fiduciary duty, conspiracy and avoidance claims:

The Honorable Craig T. Goldblatt
January 22, 2025
Page 5

In January 2016, the debtors began to wind down their operations and to liquidate substantially all of their assets. The debtors sold some of its campus properties to third-party purchasers and implemented "teach-out" plans in anticipation of permanent closures of the remaining locations. The complaint also alleges, however, that the allegedly fraudulent certifications continued throughout this period and indeed "through and beyond" the petition date in these bankruptcy cases.

During the company's liquidation, several of the defendants, who were at the time actively employed as members of the debtors' boards, were compensated in amounts ranging from $262,000 to as much as $13 million.

\*\*\*

**Conclusion**

For the reasons set forth above, the motion will be granted except for (a) the claims for breach of fiduciary duty against those defendants who are alleged to have served as directors or officers of a Delaware-incorporated entity in the period beginning three years before the petition date and those who are alleged to have served as directors of officers of a Pennsylvania-incorporated entity in the period beginning two years before the petition date; (b) the claim for civil conspiracy against the same defendants; and (c) the claims for constructive fraudulent conveyance.

*Miller v. Nelson, et al.*, 2022 WL 18401591 (*In re Art Institute of Philadelphia LLC*), Bankr. Ct. E.D.P.A., January 22, 2022), at \*3-4, \*20 (Footnotes omitted).

Finally, the EDMC data transferred to DCF was important enough to pause this case while the Parties sought, retrieved and reviewed it. Having retrieved information of wrongdoing in connection with the wind down and sale of EDMC's businesses, Defendants' suggestion that the Trustee may not use it makes no sense and is manifestly unjust.

Rather, the SAC places Defendants on fair notice that their conduct in the wind down and sale of the Debtors' businesses is at issue and no further pleading is necessary.

**The Defendants' Position**

Defendants oppose the Trustee's position that "no further pleading is necessary" and that he is not required to seek leave of this Court to amend the SAC under Federal Rule of Civil Procedure 15 to pursue his recently revealed sale-related claims.

The allegations of the SAC plainly do not "encompass and place Defendants on fair notice" of the Trustee's new charge that in November 2016 certain Defendants—together with KKR & Co. Inc. and various KKR entities, other EDMC stockholders/lenders and former EDMC Director

The Honorable Craig T. Goldblatt
January 22, 2025
Page 6

Kermit Cook—allegedly "torpedoed" the sale of certain of the Debtors' assets, and thereby allegedly caused damages ranging from $150-250 million (the "Torpedoed Sale Claims").

To the contrary, the SAC—which is predicated on the core theory that Defendants should be held liable for the November 2015 *qui tam* settlement with the Department of Justice ("DOJ") and various state attorneys general ("State AGs")—does not include **any** allegations providing "fair notice" of the Torpedoed Sale Claims. The Torpedoed Sale Claims constitute an entirely new case based on entirely new factual allegations and legal theories and seek recovery of up to a quarter of a billion dollars in entirely new damages.

Accordingly, if the Trustee wishes to pursue the Torpedoed Sale Claims in this action, the Trustee must first file a motion for leave to amend the SAC under Federal Rule 15 (made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7015) and clear the hurdles imposed by Rule 15. The Defendants would then be entitled to contest that motion on all available grounds, including but not limited to the Trustee's failure to diligently pursue these purported claims, the prejudice that Defendants would suffer if the Trustee were allowed to pursue these claims, and the ground that these claims are time-barred. The Court should resolve this issue now as its resolution could substantially impact the scope of fact discovery, expert testimony and discovery, and all further proceedings.

**The *Qui Tam* Claims Pled in the SAC**

The parties have been litigating this case for four-and-a-half years based on the factual allegations and claims pled in the Trustee's original Complaint (filed June 17, 2020), First Amended Complaint (filed February 15, 2022) (the "FAC"), and SAC (filed September, 22, 2022).

Since day one, the Trustee's complaints have been predicated on claims of supposed wrongdoing allegedly resulting in the 2015 settlement of the *qui tam* litigation with DOJ and the State AGs (the "*Qui Tam* Claims"). The core theory underlying the *Qui Tam* Claims is that, "[i]n breach of their fiduciary duties to the Company, the Defendants caused the EDMC Companies to operate in violation of the federal laws and regulations applicable to the Debtors' ownership and management of post-secondary for-profit learning institutions—*i.e.*, Title IV . . . of the Higher Education Act of 1965 . . . and in violation of applicable state laws and regulations," and "Defendants conspired among themselves and the more than 100 EDMC operating subsidiaries to engage in this illegal behavior." (SAC, ¶ 3). This conduct allegedly "result[ed] in fines and penalties exceeding $95 million, numerous consent decrees and the loss of more than $100 million of outstanding tuition obligations by way of loan forgiveness, the combination of which crippled the Debtors and ultimately resulted in their demise." (*Id.*).

Following the Court's January and August 2022 rulings on Defendants' Motions to Dismiss, the operative remaining claims in the SAC are:

> **Count I – Breach of Fiduciary Duty**: The Trustee alleges that the Defendants "breached the duties of loyalty and care" by "operating the EDMC Companies in an illegal manner and exposing them to substantial liabilities" (*id.*, ¶ 158); "implementing a business model

The Honorable Craig T. Goldblatt
January 22, 2025
Page 7

and plan the purpose and effect of which was to fuel growth by engaging in unlawful recruiting methods" (*id.*, ¶ 159); and "failing to put in place appropriate internal controls and a proper corporate governance framework to detect and terminate unlawful recruiting and enrollment practices violative of the Incentive Compensation Ban and other governing federal and state laws and regulations" (*id.*, ¶ 160).

**Count III – Civil Conspiracy**:  The Trustee alleges that "Defendants conspired with each other, and with each operating entity of EDMC—*i.e*[.], the individual schools—to perpetrate, facilitate, and perpetuate the breaches of fiduciary duty, fraud, violations of federal law and other wrongs alleged herein."  (*Id.*, ¶ 171).

In addition, the Trustee seeks in Counts VII through X of the SAC to avoid and recover pre-petition payments made to certain Defendants that he deems "Excessive Payments."  (*Id.*, ¶¶ 135–48, 187–218).  With respect to these payments, the Trustee alleges that "[t]he Debtors failed to receive reasonably equivalent value . . . especially in light of said Defendants' participation in the wrongdoing which caused the Debtors' demise" (*id.*, ¶ 146); the payments "were not made in the ordinary course of business, as they consisted largely of unwarranted bonus payments for engaging in unlawful activity" (*id.*, ¶ 191); and the defenses to these payments lack merit because Defendants "were running an essentially illegal business" (*id.*, ¶ 201).

In ruling on the Defendants' Motions to Dismiss the Trustee's original Complaint, the Court framed the Trustee's theory as "alleg[ing] that the debtors established compensation systems that encouraged . . . aggressive recruiting practices" and that "[t]hese practices were alleged to violate various state and federal laws governing for-profit colleges."  (1/12/22 Opinion, p. 1).  The court further noted that, "[f]ollowing a series of government investigations and *qui tam* actions, the complaint alleges that the debtors were forced to pay fines, penalties, and settlements that led to the destruction of their business."  (*Id.*, pp. 1–2).  The Court ruled that the Trustee had stated claims for breach of fiduciary duty based on the allegations that the Defendants "implemented, or failed to reform, unlawful compensation and recruiting practices."  (*Id.*, p. 16).

Thus, the operative claims—and all supporting factual allegations—in the Complaint (and later, the FAC and SAC) focus exclusively on breaches of duty arising from alleged recruiting and compensation violations that allegedly resulted in the 2015 Settlement.

**The Torpedoed Sale Claims That Are Not Pled in the SAC**

On November 11, 2024, the Trustee served his mediation submission raising for the first time ever his intention to pursue the Torpedoed Sale Claims against certain Defendants in this action, causing the cancellation of the December 4, 2024 mediation.  The Trustee has never pled, articulated, or even hinted at his Torpedoed Sale Claims in any filing in this action, but his mediation statement was an almost verbatim version of a complaint that he subsequently filed in state court in Pennsylvania.

On December 20, 2024, the Trustee filed a complaint in the Philadelphia Court of Common Pleas against KKR and other EDMC stockholders and lenders (the "Stockholder/Lender

The Honorable Craig T. Goldblatt
January 22, 2025
Page 8

Defendants") and Mr. Cook asserting the Torpedoed Sale Claims (the "State Court Complaint," a copy of which is attached as Exhibit A). In the State Court Complaint, the Trustee contends that the named defendants—together with various "EDMC Wrongdoers"—"torpedoed opportunities to sell" the Argosy University and South University education systems to National University or Cerberus "for up to hundreds of millions of dollars" and caused the sale of the schools "to DCF for less than nothing." (Ex. A, ¶¶ 6–7, 145–57). The "EDMC Wrongdoers"—defined as former EDMC directors and/or officers McEachen, Danielson, Jalufka, Kramer and Novad—are not named as defendants in the State Court Complaint, but are named as defendants in the SAC. The Trustee contends that these purported sale opportunities were torpedoed in mid-November and mid-December of 2016. (*Id.*, ¶¶ 145–57).

The State Court Complaint asserts (i) in Count I that the Stockholder/Lender Defendants and Mr. Cook breached alleged fiduciary duties to EDMC; (ii) in Count II that the Stockholder/Lender Defendants aided and abetted breaches of fiduciary duty by Mr. Cook and the EDMC Wrongdoers, and that Mr. Cook aided and abetted breaches of fiduciary duty by the EDMC Wrongdoers; and (iii) in Count III that the Stockholder/Lender Defendants and Mr. Cook conspired with each other and conspired with the EDMC Wrongdoers to perpetrate the alleged breaches of fiduciary duty.

**The SAC Does Not Provide "Fair Notice" of the Torpedoed Sale Claims**

Whether a later proposed claim "relates back" to a pending complaint turns on whether the pending complaint provided the existing defendants "fair notice" of the proposed claim. *See, e.g.*, *Glover v. F.D.I.C.*, 698 F.3d 139, 145–46 (3d Cir. 2012). The Third Circuit has warned that, "[p]leadings are not like magic tricks, where a plaintiff can hide a claim with one hand, only to pull it from her hat with the other." *Id.* at 148. "Rule 15(c) endeavors to preserve the important policies served by the statute of limitations—most notably, protection against the prejudice of having to defend against a stale claim, as well as society's general interest in security and stability—by requiring 'that the already commenced action sufficiently embraces the amended claims.'" *Id.* at 145.

As this Court recognized *In re Maxus Energy Corp.*, "[i]f 'the alteration of the original pleading is so substantial that it cannot be said that defendant was given adequate notice of the conduct, transaction, or occurrence that forms the basis of the new [proposed] claim . . . , then the amendment will not relate back and will be time barred if the limitations period has expired.'" 2023 WL 5543612, at *7 (Bankr. D. Del. Aug. 28, 2023) (Goldblatt, J.).

The Defendants will demonstrate that the Torpedoed Sale Claims do not relate back to the SAC and are time-barred because, among other things, the Trustee failed to file these purported claims within two years after EDMC's filing for bankruptcy (*i.e.*, prior to June 29, 2020). *See* 11 U.S.C. Section 108(a).[1]

---

[1] This Court has held that "11 U.S.C. § 108(a) extends the period by which the debtor may bring a claim if the statute of limitations on that claim had not run prior to the petition date" and "[u]nder

The Honorable Craig T. Goldblatt
January 22, 2025
Page 9

Here, the SAC plainly does not provide "fair notice" of the proposed Torpedoed Sale Claims, and the Trustee's assertion that "the facts underlying the [proposed] sale-related allegations . . . merely restate the existing claims with greater particularity and amplify the factual circumstances surrounding the transactions and occurrences described in the SAC" is incorrect for numerous reasons:

*First*, the SAC does not contain any allegations or claims that provide the Defendants with any notice (let alone "fair notice") that they would be charged with alleged wrongdoing in "torpedoing" a sale of the Debtors' assets. The notion that the Torpedoed Sale Claims—which are spelled out in 242 paragraphs over 45 pages in the State Court Complaint—are "encompass[ed]" by the SAC lacks merit. The SAC is based on the *Qui Tam* Claims—and there is no mention of the proposed sale to National University and no allegation of any misconduct in connection with selling any of the Debtors' assets, including the sale to DCF. Nor does the SAC mention National University, the Stockholder/Lender Defendants, Mr. Cook or any other party allegedly involved in the alleged "torpedoing" of a sale.

*Second*, the claims for breach of fiduciary duty (Count I) and civil conspiracy (Count III) in the SAC specifically plead that those claims are predicated solely on allegations that the Defendants "breached duties" and "conspired" in connection with the alleged implementation of, or failure to reform, supposedly unlawful compensation and recruiting practices. Those counts do not mention any purported breaches or conspiracy in connection with any purported "torpedoing" of a potential sale of Debtors' assets or the sale to DCF.

*Third*, the Excessive Payment claims in Counts VII through X are wholly unrelated to the alleged events, transactions and/or occurrences underlying the Torpedoed Sale Claims. The SAC contains no allegations from which one could infer or deduce that the Trustee would seek to recover those payments on the ground that Defendants "torpedoed" a sale of the Debtors' assets.

*Fourth*, the SAC refers to the sale of assets to DCF, but it does not allege any wrongdoing in connection with the sale to DCF and does not challenge the propriety of the sale to DCF. The DCF transaction is mentioned only in the context of explaining that "the 2015 Settlements and the [alleged] revelation of the Company's illegal practices sent the company into a downward spiral," which resulted in a pre-petition wind-down of the Company that led to the sale of various assets. (SAC, ¶¶ 122–30). But there is no suggestion of any purported wrongdoing in connection with the DCF sale.

*Fifth*, the SAC pleads specific damages "in an amount in excess of $200,000,000," which allegedly includes the $95.5 million paid in the 2015 settlements and $102.8 million in loan forgiveness. (SAC, ¶¶ 1, 109, 117–19, 121–22, Relief Requested ¶ (a)). The Trustee is now

---

this section, the debtors (and, by extension, the trustee) would have had until two years after the petition date to initiate this claim." *In re Start Man Furniture, LLC*, 2023 WL 2717662, at *3 (Bankr. D. Del. Mar. 30, 2023) (Goldblatt, J.). Accordingly, the Trustee was required to file his Torpedoed Sale Claims by June 29, 2020 (two years from EDMC's bankruptcy petition).

The Honorable Craig T. Goldblatt
January 22, 2025
Page 10

proposing an entirely new claim for damages ranging from $150-250 million allegedly flowing from the "torpedoed" sales. The SAC does not provide "fair notice" that certain Defendants would potentially face additional claims for damages of up to a quarter of a billion dollars (on claims that are neither mentioned nor suggested in the SAC).

*Finally*, the Trustee's intention to pursue the Torpedoed Sale Claims in this action—*eight years* after the sale was allegedly "torpedoed" in November 2016, *six-and-a-half years* after the filing of the bankruptcy petition in June 2018 and *four-and-a-half years* after the filing of this action in June 2020—raises serious questions as to whether the Trustee diligently investigated and pursued these claims. Even assuming that the Torpedoed Sale Claims are valid claims (which Defendants vigorously dispute), the Defendants are prepared to demonstrate that the Trustee knew or reasonably should have known of these purported claims *years* before he first revealed his intention to pursue them in November 2024.

The Defendants join the request for a conference with the Court, at which time the Defendants will argue that the Trustee, if he wishes to pursue the Torpedoed Sale Claims, must file a motion for leave to amend his complaint – for the third time – under Rule 15 and the Defendants must be afforded a full and fair opportunity to brief and oppose such a motion. Whether the Trustee will be permitted to pursue the Torpedoed Sale Claims is a significant issue that must be decided now because the Court's decision on this issue could significantly impact the scope of all remaining proceedings in this action.

Respectfully submitted,


/s/ Colin R. Robinson
Bradford J. Sandler (DE Bar No. 4142)
Colin R. Robinson (DE Bar No. 5524)
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor

The Honorable Craig T. Goldblatt
January 22, 2025
Page 11

P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Telephone: 302-652-4100
Facsimile:  302-652-4400
E-mail:  bsandler@pszjlaw.com
          crobinson@pszjlaw.com

Steven M. Coren (*pro hac vice*)
Benjamin M. Mather (*pro hac vice*)
COREN & RESS, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
(215) 735-8700

*Counsel for George L. Miller, Chapter 7 Trustee*

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Sean M. Beach (DE Bar No. 4070)
Kevin A. Guerke (DE Bar No. 4096)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: 302-571-6600
Facsimile: 302-571-1253
E-mail: sbeach@ycst.com
kguerke@ycst.com

NELSON MULLINS RILEY & SCARBOROUGH LLP
Thomas S. Jones (*pro hac vice*)
6 PPG Place, Suite 700
Pittsburgh, PA 15222
Telephone: (412) 730-3071
Email: thomas.jones@nelsonmullins.com

*Attorneys for Defendants John Devitt Kramer and Mark Novad*

RICHARDS, LAYTON & FINGER, P.A.

Marcos A. Ramos (DE Bar No. 4450)
Zachary J. Javorsky (DE Bar No. 7069)

The Honorable Craig T. Goldblatt
January 22, 2025
Page 12

One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651 7700
Facsimile: (302) 651-7701
ramos@rlf.com
javorsky@rlf.com

MORGAN, LEWIS & BOCKIUS LLP

Michael L. Kichline (*pro hac vice*)
2222 Market Street
Philadelphia, PA 19103-3007
Telephone: (215) 963-5000
Facsimile: (215) 963-5001
michael.kichline@morganlewis.com

*Counsel for Defendants Edward West and Mick Beekhuizen*

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Sean M. Beach (DE Bar No. 4070)
Kevin A. Guerke (DE Bar No. 4096)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: 302-571-6600
Facsimile: 302-571-1253
E-mail: sbeach@ycst.com
kguerke@ycst.com

SIDLEY AUSTIN LLP

Sam Newman (*pro hac vice*)
Genevieve Weiner (*pro hac vice*)
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: 310-595-9500
Facsimile: 310-595-9501
Email: sam.newman@sidley.com
gweiner@sidley.com

The Honorable Craig T. Goldblatt
January 22, 2025
Page 13

Eric Schwartz (*pro hac vice*)
Brian Tobin (*pro hac vice*)
Anna Gumport (*pro hac vice*)
555 West Fifth Street
Los Angeles, California 90013
Telephone: 213-896-6000
Facsimile: 213-896-6600
E-mail: eschwartz@sidley.com
btobin@sidley.com
agumport@sidley.com

*Counsel for Defendants Mark A. McEachen and John Danielson*

BLANK ROME LLP

John E. Lucian (*pro hac vice*)
1201 N. Market Street
Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464
E-mail: john.lucian@blankrome.com

*Counsel for Defendant Frank Jalufka*

# EXHIBIT A

**COREN & RESS, P.C.**
By:    **Steven M. Coren, Esquire**
         **John W. Morris, Esquire**
**Two Commerce Square, Suite 3900**
**2001 Market Street**
**Philadelphia, PA 19103**
**PA. I.D. Nos.: 32140; 4125**
**Phone: (215) 735-8700**



*Filed and Attested by the Office of Judicial Records 20 DEC 2024 12:54 pm C. SMITH*

**Attorneys for Plaintiff**

| | |
|---|---|
| GEORGE L. MILLER, Chapter 7 Trustee for Education Management Corporation, (A Pennsylvania Corporation), *et al.*[1] 1628 John F Kennedy Blvd, #950 Philadelphia, PA 19103<br><br>                    *Plaintiff,*<br><br>                        *v.*<br><br>KKR & CO. INC. 30 Hudson Yards, Ste. 7500 New York, NY 10001, *et al.,*<br><br><br>                    *Defendants.* | COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>NOVEMBER TERM 2024<br><br>Civil Action No. 241101799<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

---

[1] Plaintiff is the Chapter 7 Trustee of the Debtors (the "Debtors") in the jointly administered bankruptcy cases in the United States Bankruptcy Court for the District of Delaware captioned, *In re: The Art Institute of Philadelphia, LLC, et al.*, U.S.B.C., D.Del., Case No. 18-11535 (CTG), which include the following entities: American Education Centers, Inc.; Argosy Education Group, Inc.; Argosy University of California LLC); Brown Mackie College - Tucson, Inc.; Education Finance III LLC; Education Management LLC; Education Management II LLC; Education Management Corporation; Education Management Holdings II LLC; Higher Education Services II LLC; Miami International University of Art & Design, Inc.; South Education – Texas LLC; South University of Florida, Inc.; South University of Michigan, LLC; South University of North Carolina LLC; South University of Ohio LLC; South University of Virginia, Inc.; South University, LLC; Stautzenberger College Education Corporation; TAIC-San Diego, Inc.; TAIC-San Francisco, Inc.; The Art Institutes International Minnesota, Inc.; The Art Institute of Atlanta, LLC; The Art Institute of Austin, Inc.; The Art Institute of California-Hollywood, Inc.; The Art Institute of California-Inland Empire, Inc.; The Art Institute of California - Los Angeles, Inc.; The Art Institute of California-Orange County, Inc.; The Art Institute of California-Sacramento, Inc.; The Art Institute of Charleston, Inc.; The Art Institute of Charlotte, LLC; The Art Institute of Colorado, Inc.; The Art Institute of Dallas, Inc.; The Art Institute of Fort Lauderdale, Inc.; The Art Institute of Houston, Inc.; The Art Institute of Indianapolis, LLC; The Art Institute of Las Vegas, Inc.; The Art Institute of Michigan, Inc.; The Art Institute of Philadelphia LLC; The Art Institute of Pittsburgh LLC; The Art Institute of Portland, Inc.; The Art Institute of Raleigh-Durham, Inc.; The Art Institute of St. Louis, Inc.; The Art Institute of San Antonio, Inc.; The Art Institute of Seattle, Inc.; The Art Institute of Tampa, Inc.; The Art Institute of Tennessee-Nashville, Inc.; The Art Institute of Virginia Beach LLC; The Art Institute of Washington, Inc.; The Art Institutes International II LLC; The Illinois Institute of Art at Schaumburg, Inc.; The Illinois Institute of Art, Inc.; The Institute of Post-Secondary Education, Inc.; The New England Institute of Art, LLC; The University of Sarasota, Inc.;Western State University of Southern California.

Case ID: 241101799

# NOTICE TO DEFEND

**NOTICE**

You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHETHER YOU CAN GET LEGAL HELP.**

Philadelphia Bar Association
Lawyer Referral and Information Service
One Reading Center
Philadelphia, PA 19107
Telephone:  (215) 238-6333

**AVISO**

Le han demandado a usted en la corte.  Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notification.  Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona.  Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion.  Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda.  Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

**LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE.  SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL**.

Asociacion de Licenciados de Filadelfia
Servicio de Referencia e Informacion Legal
One Reading Center
Filadelfia, PA 19107
Telefono: (215) 238-6333

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

COMPLAINT ...................................................................................................................... 1

I.      INTRODUCTION ..................................................................................................... 1

II.     PARTIES ................................................................................................................... 3

        The Plaintiff ........................................................................................................... 3

        The Defendants ...................................................................................................... 4

III.    FACTS ...................................................................................................................... 8

        A.      EDMC is Founded in 1962 and Expands Over the Next Four Decades ................. 8

        B.      The 50/50 Rule is Repealed and the Private Equity Investors Take Over
                EDMC ....................................................................................................................... 9

        C.      The Private Equity Investors Recruit a For-Profit Education Veteran with a
                Checkered Past ....................................................................................................... 10

        D.      Federal and State Governments Investigate Misconduct at EDMC ...................... 10

        E.      The Qui Tam Actions and State Investigations ..................................................... 11

        F.      Eligibility for Programs under Title IV of the Higher Education Act of 1965 ...... 13

        G.      EDMC's Participation in Title IV Programs .......................................................... 14

        H.      "Gainful Employment" Regulations Substantially Impair the Financial
                Viability of EDMC's Ai Systems ......................................................................... 15

        I.      EDMC Undergoes an Out-of-Court Restructuring: Debt is Reduced;
                Company Lenders Acquire a 96% Equity Stake; the Board is Shuffled; and
                Private Equity Giant KKR—the Largest EDMC Shareholder—Appoints Two
                Board Members,  Defendant Cook and EDMC Wrongdoer McEachen Who
                Becomes CEO ......................................................................................................... 17

        J.      EDMC Settles the Qui tam Actions ...................................................................... 18

        K.      Defending the Qui tam Actions and Feigning Innocence, EDMC Secretly
                Planned To Liquidate its Businesses, and Hired HL to Effectuate the Process,
                Only to Have KKR, Cook and EDMC Wrongdoers—Motivated by Conflicted
                Loyalties to KKR and Personal Interests—Breach their Fiduciary Duties to
                EDMC When they Torpedoed Potential Sales Of South and Argosy for up to
                $150 Million and Sold the Schools to DCF for Less than Zero, While EDMC
                Wrongdoers Lined their Pockets with Bonuses ..................................................... 19

i

Case ID: 241101799

(i)     Project Pluto—South and Argosy Have Buyers, Ai Does Not ..................19

(ii)    KKR Title IV Exposure for its Substantial Investment in Laureate and Officer/Director Exposure Under Title IV Take Center Stage and Hijack the Sale Process ..................................................................................21

(iii)   KKR, Cook and EDMC Wrongdoers Torpedo Potential Sales to South and Argosy for up to $150 Million, Opting Instead to Sell Ai, South and Argosy to DCF for Less than Nothing ........................................................26

        (a)     National University ..................................................................26

        (b)    Cerberus ...................................................................................29

        (c)     DCF ..........................................................................................30

L.     KKR Board Designee McEachen and Other EDMC Wrongdoers Mislead HL, Lenders and Other Stakeholders as to, Among Other Things, the Viability of the Cerberus and National Offers and, Along with KKR and Cook, Caused EDMC to Reject Them in Favor of an Inferior Deal with DCF Which Benefitted KKR, Cook and EDMC Wrongdoers .....................................................33

M.    While the Company Disintegrated, Certain EDMC Directors and Officers, Including KKR Board Designee McEachen Looted the Company on their Way Out the Door .............................................................................................37

N.     The Discovery Rule ...............................................................................................38

O.     Fraudulent Concealment .......................................................................................40

IV.    CAUSES OF ACTION ....................................................................................................42

COUNT I – BREACH OF FIDUCIARY DUTY ..............................................................42

COUNT II – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY ...............44

COUNT III – CIVIL CONSPIRACY ...............................................................................44

V.     RELIEF REQUESTED .....................................................................................................45

VI.    JURY DEMAND ..............................................................................................................45

ii

Case ID: 241101799

**COMPLAINT**

## I.     INTRODUCTION

1.      Plaintiff George L. Miller, the Chapter 7 Trustee (the "Trustee") for the jointly administered Chapter 7 bankruptcy estates of Debtors Education Management Corporation ("EDMC") and subsidiaries (collectively, the "Company" or the "EDMC Companies" or the "Debtors"), by and through his counsel, brings this action to recover compensatory and punitive damages arising out of Defendants breaches of fiduciary duty, aiding and abetting the breach of fiduciary duty by others, and civil conspiracy.

2.      This case arises from the demise of the EDMC Companies, a conglomerate of one of the largest for-profit providers of secondary education in the world, whose exponential growth was fueled by private equity investors that implemented illegal recruiting and compensation schemes to pump up growth and tap federal student loan funds, and the sale for less than zero of three EDMC education systems—The Art Institutes ("Ai"), Argosy University ("Argosy"), and South University ("South," and collectively, the "Schools")—to Dream Center Education Foundation and affiliates ("DCF").

3.      EDMC's operations were subject to and its revenues highly dependent on government funding under Title IV ("Title IV") of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1070, et *seq*. (the "HEA").  After years of defending qui tam claims alleging Title IV violations, EDMC settled litigation under the False Claims Act, along with investigations of numerous state attorneys general, for ~$200 million.

4.      Hobbled by its qui tam liabilities, EDMC marketed its education systems for sale. South and Argosy were profitable and valued at hundreds of millions of dollars, but Ai was losing

Case ID: 241101799

millions each year and was in danger of losing access to federal funds and going out of business while Title IV funds lent to Ai students remained outstanding.

5. After a debt-to-equity restructuring in late 2014 and early 2015, EDMC's then largest shareholder and second largest debt-holder, private equity giant Defendant KKR & Co. Inc. (collectively, with the other KKR entities named as defendants herein, "KKR") appointed two directors to EDMC's board—Defendant Kermit Cook ("Cook") and Mark A. McEachen ("McEachen")—who were tasked to wind-down and sell the Company.

6. Cook, McEachen, and EDMC directors and officers John M. Danielson ("Danielson"), J. Devitt Kramer ("Kramer"), Frank Jalufka ("Jalufka") and Mark Novad ("Novad")(McEachen, Danielson, Kramer, Jalufka and Novad are hereinafter referred to collectively as the "EDMC Wrongdoers), torpedoed opportunities to sell South and Argosy for up to hundreds of millions of dollars to buyers having no interest in Ai when they learned that a shutdown or bankruptcy of Ai while Title IV funds advanced to EDMC students remained outstanding would:

- jeopardize KKR's substantial investment in Laureate Education ("Laureate")—an unrelated for-profit secondary school business that also relied on Title IV funding;

- expose Defendants and EDMC Wrongdoers to potential personal liability to repay outstanding Title IV funds; and,

- expose Defendants and EDMC Wrongdoers to potential disqualification from affiliation with other education institutions that accepted Title IV funds.

7. Defendants protected KKR and themselves at the expense of the Company and its creditors by causing the Company to sell the Schools to DCF for less than nothing, which ensured that Ai would not shut down or file for bankruptcy on their watch.

8. To accomplish the sale to DCF, EDMC Wrongdoers, with the knowledge and substantial assistance of the Defendants, hid other offers, made misrepresentations about the

2

Case ID: 241101799

consequences of the sale, induced EDMC lenders to agree to the sale of the three education systems to DCF by falsely portraying that sale as "the only option," exported EDMC's electronically stored information to DCF without retaining copies and doctored EDMC Board minutes to assiduously conceal their scheme.

9.   Compounding the injury to the Debtors, EDMC Wrongdoers, with the knowledge and substantial assistance of the Defendants, abused their positions of trust, lined their pockets and looted the EDMC Companies of more than $20 million while the EDMC Companies sold off parts of their business for pennies on the dollar and spiraled out of existence.

## II.   PARTIES

### The Plaintiff

10.   Plaintiff George L. Miller is the duly appointed Chapter 7 Trustee of the Debtors.

11.   On June 29, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 7 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware – with the cases being jointly administered under the caption, *In re Art Institute of Philadelphia, LLC*, *et al.*, U.S.B.C. D. Del., Case No. 18-11535 (LSS) (collectively, the "Bankruptcy Cases").

12.   The corporate structure of the EDMC Companies includes (a) ultimate parent Education Management Corporation ("EDMC"), a Pennsylvania Corporation, (b) four intermediate holding companies (collectively, the "Delaware Holding Companies"), i.e., Education Management Holdings, LLC, Education Management LLC, Education Management Holdings II, LLC, and Education Management II LLC, each of which is a Delaware limited liability company for which EDMC served as the sole and managing member, and (c) numerous

3

Case ID: 241101799

for-profit learning institutions that were wholly-owned subsidiaries of the Delaware Holding Companies.

13. At its peak in 2011, the Debtors had approximately 160,000 students and operated four different education systems (The Art Institutes, Argosy University, Brown Mackie Colleges and South University) and an ABA accredited law school, Western State University College of Law.

**The Defendants**

14. Defendant KKR & Co. Inc. ("KKR Inc.") is a Delaware corporation with its principal place of business at 30 Hudson Yards, Ste. 7500, New York, NY 10001.

15. Defendant KKR & Co. LP ("KKR LP") is a Delaware limited partnership whose partners are currently unknown, with a place of business at 30 Hudson Yards, Ste. 7500, New York, NY 10001.

16. Defendant KKR Credit Advisors (US) LLC ("KKR Credit") is a Delaware limited liability company with a place of business at 555 California Street, 50th Floor, San Francisco, California 94104. Defendants KKR Inc., KKR LP, and KKR Credit are hereinafter collectively referred to as the "KKR Entity Defendants."

17. Defendant Kermit Cook ("Cook") is an individual who resides at 41 Hancock Ln., Darien, CT 06820-2511.

18. Defendant FS KKR Capital Corp., f/k/a Corporate Capital Trust Inc., is a Pennsylvania corporation ("FS KKR Capital"), with its principal place of business at 201 Rouse Blvd., Philadelphia, PA 19112-1902.

19. Defendant 8 Capital Partners L.P. ("8 CP L.P.") is a Cayman Islands limited

4

Case ID: 241101799

partnership whose partners are currently unknown, with a place of business at 30 Hudson Yards, Ste. 7500, New York, NY 10001.

20. Defendant BCBSM, Inc. ("BCBSM") is a Minnesota corporation with a place of business at 3400 Yankee Dr., Eagan, MN, 55121-1627.

21. Defendant KKR-PBPR Capital Partners L.P. ("KKR-PBPR") is a Delaware limited partnership whose partners are currently unknown with a place of business at 30 Hudson Yards, Ste. 7500, New York, NY 10001.

22. Defendant KKR Corporate Credit Partners L.P. ("KKR CCP") is a Cayman Islands limited partnership whose partners are currently unknown, with a place of business at 30 Hudson Yards, Ste. 7500 New York, NY 10001.

23. Defendant KKR Credit Relative Value Master Fund L.P. ("KKR CRVMF") is a Cayman Islands limited partnership whose partners are currently unknown, with a place of business at 30 Hudson Yards, Ste. 7500, New York, NY 10001.

24. Defendant KKR Debt Investors II (2006) (Ireland) L.P. ("KKR Debt Investors") is an Ireland limited partnership whose partners are currently unknown, with a place of business at 30 Hudson Yards, Ste. 7500, New York, NY 10001.

25. Defendant KKR Financial CLO 2005-1, Ltd. ("KKR F CLO 2005-1") is a Cayman Islands limited company with a place of business at 555 California Street, 50th Floor, San Francisco, California 94104.

26. Defendant KKR Financial CLO 2005-2, Ltd. ("KKR F CLO 2005-2") is a Cayman Islands limited company with a place of business at 555 California Street, 50th Floor, San Francisco, California 94104.

Case ID: 241101799

27. Defendant KKR Financial CLO 2006-1, Ltd. ("KKR F CLO 2006-1") is a Cayman Islands limited company with a place of business at 555 California Street, 50th Floor, San Francisco, California 94104.

28. Defendant KKR Financial CLO 2007-1, Ltd. ("KKR F CLO 2007-1") is a Cayman Islands limited company with a place of business at 555 California Street, 50th Floor, San Francisco, California 94104.

29. Defendant KKR Financial CLO 2011-1, Ltd. ("KKR F CLO 2011-1") is a Cayman Islands limited company with a place of business at 555 California Street, 50th Floor, San Francisco, California 94104.

30. Defendant KKR Financial Holdings III, LLC ("KKR Financial Holdings") is a Delaware limited liability company with a place of business with a place of business at 555 California Street, 50th Floor, San Francisco, California 94104.

31. Defendant KKR Floating Rate Fund L.P. ("KKR Floating Rate Fund") is a Cayman Islands limited partnership whose partners are currently unknown, with a place of business at 30 Hudson Yards, Ste. 7500, New York, NY 10001.

32. Defendant KKR Lending Partners L.P. ("KKR Lending Partners") is a Delaware limited partnership whose partners are currently unknown, with a place of business at 30 Hudson Yards, Ste. 7500, New York, NY 10001.

33. Defendant KKR-Milton Capital Partners L.P. ("KKR Milton") is a Cayman Islands limited partnership whose partners are currently unknown, with a place of business at 555 California Street, 50th Floor, San Francisco, California 94104.

34. Defendant KKR Strategic Capital Institutional Fund, Ltd. ("KKR Strategic Capital") is a Cayman Islands limited partnership whose partners are currently unknown, with a

6

place of business at 555 California Street, 50th Floor, San Francisco, California 94104.

35.    Defendant Maryland State Retirement and Pension System ("Md State Retirement System") is a Maryland governmental agency with a place of business at 120 East Baltimore Street, Baltimore, MD 21202.

36.    Defendant Oregon Public Employees Retirement Fund ("Oregon PERF") is a Maryland governmental agency with a place of business at 11410 SW 68th Parkway, Tigard, OR 97223.

37.    Defendant Spruce Investors Limited ("Spruce Investors") is a Cayman Islands limited company whose partners are currently unknown, with a place of business at 30 Hudson Yards, Ste. 7500, New York, NY 10001.

38.    Defendant US Income Strategy Fund ("USISF") is a Cayman Islands registered fund with a place of business at 30 Hudson Yards, Ste. 7500, New York, NY 10001.

39.    After the EDMC restructuring hereinafter described, and all times material hereto, Defendants FS KKR Capital, 8 CP L.P., BCBSM, KKR-PBPR, KKR CCP, KKR CRVMF, KKR Debt Investors, KKR F CLO 2005-1, KKR F CLO 2005-2, KKR F CLO 2006-1, KKR F CLO 2007-1, KKR F CLO 2011-1, KKR Financial Holdings, KKR Floating Rate Fund, KKR Lending Partners, KKR Milton, KKR Strategic Capital, Md State Retirement System, Oregon PERF, Spruce Investors and USISF (collectively referred to the "KKR EDMC Shareholder/Lender Defendants") were EDMC's largest shareholder and second largest debt holder and they controlled two seats on the EDMC Board.

40.    At all times material hereto, the KKR EDMC Shareholder/Lender Defendants were managed, controlled and represented by the KKR Entity Defendants, which acted as the agents of, for and on behalf of the KKR EDMC Shareholder/Lender Defendants on matters related to EDMC

7

Case ID: 241101799

and its businesses, including the wind-down and sale of the businesses owned and operated by EDMC and its affiliates. The KKR EDMC Shareholder/Lender Defendants and the KKR Entity Defendants are sometimes collectively referred to as KKR.

## III.    FACTS

### A.  EDMC is Founded in 1962 and Expands Over the Next Four Decades

41.    EDMC was founded in 1962.  It acquired the Art Institute of Pittsburgh in or around 1970 and launched additional schools in the Art Institutes system.

42.    In November 1996, after expanding the Art Institutes chain and growing enrollment into thousands, EDMC and certain shareholders sold shares of EDMC's common stock to the public in an initial public offering raising $45 million.

43.    In 2001, EDMC purchased rival for-profit education group Argosy Education Group, Inc. ("Argosy"), for $78 million.  At the time, EDMC operated 22 Art Institutes and two other schools.  Argosy operated seven educational institutions across the country with more than 5000 students.

44.    In April 2003, EDMC acquired South University ("South").

45.    In June 2003, EDMC acquired American Education Centers ("AEC") (and its 18 for-profit colleges) for $116 million.  The AEC schools were later re-branded as Brown-Mackie College ("Brown-Mackie").  With this acquisition, enrollment at EDMC-owned schools topped 50,000.

46.    In 2006, Congress deregulated online education by removing the "50 Percent Rule" or "50/50 Rule."  The 50 Percent Rule had required institutions of higher education to enroll more

8

than half their students in campus-based programs (as opposed to online programs) to obtain full access to federal funding of student loans.

## B. The 50/50 Rule is Repealed and the Private Equity Investors Take Over EDMC

47.    The removal of the 50/50 Rule led to explosive growth at for-profit educational institutions providing primarily online course offerings.

48.    Wall Street investment bankers quickly seized upon the lucrative opportunity posed by deregulation—investing in for-profit educational institutions and implementing enrollment strategies to achieve hypergrowth and capture student aid funds.

49.    In 2006, EDMC was acquired in a $3.4 billion highly leveraged buyout (the "2006 LBO") by a consortium of private equity investors, including Goldman Sachs Capital Partners, Providence Equity Partners, and Leeds Equity Partners (collectively the "Private Equity Investors").

50.    To service the substantial debt incurred in the 2006 LBO of approximately $2 billion and seek to drive out-sized returns from their investments, the Private Equity Investors changed the culture of EDMC to pursue aggressive growth strategies that undermined academic quality and opportunity and were driven by unlawful recruiting and enrollment practices.

51.    A ten-fold increase in online student enrollment followed in the next five years driven by EDMC's oversized recruiter team.  By 2010, the Company employed one recruiter for every 28 students, while each career counselor was responsible for 493 students and each student services staffer was responsible for 133 students.

9

Case ID: 241101799

**C. The Private Equity Investors Recruit a For-Profit Education Veteran with a Checkered Past**

52. Shortly after the Private Equity Investors took over EDMC, they moved quickly to institute leadership that would focus on unrestrained growth in enrollment, including a leader whose prior education system was sanctioned heavily for violating federal law.

53. According to the Huffington Post's 2011 article titled "With Goldman's Foray Into Higher Education, A Predatory Pursuit of Students and Revenues," by early 2007, "EDMC was already a substantially changed company compared to its pre-buyout days."

54. The new focus on online enrollment, with its easy access to plentiful federal student loan funds, fueled explosive growth. Online student enrollment of 4,000 increased tenfold in the following five years driven by aggressive recruiting of unqualified students.

55. By 2011, enrollment had doubled to 160,000 students, making the Company the second largest for-profit higher education company in the country.

56. During this period, annual revenue nearly tripled to $2.8 billion (nearly 90 percent of which came from the federal student aid programs).

**D. Federal and State Governments Investigate Misconduct at EDMC**

57. On August 3, 2010, the United States Government Accountability Office ("GAO") released a report entitled "For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Questionable Marketing Practices" (the "GAO Report").

58. On August 4, 2010, the United States Senate Committee on Health, Education, Labor and Pensions ("HELP Committee") held a hearing related to its investigation of for-profit education providers. It was revealed at the hearing that EDMC systematically employed improper practices related to student recruiting, enrollment, admissions, and financial aid.

10

Case ID: 241101799

59.     On July 30, 2012, Senator Tom Harkin, Chairman of the HELP Committee, unveiled a report on the findings of the Committee's two-year investigation of the for-profit higher education industry entitled, For-Profit Higher Education: the Failure to Safeguard the Federal Investment and Ensure Student Success (the "HELP Report").

60.     The HELP Report outlines widespread problems throughout the for-profit educational sector, and pinpointed institutional problems at EDMC in its quest to capture federal revenues and profit through enormous growth in enrollment.

61.     As detailed in the GAO Report, HELP Committee hearing testimony and in the 2012 HELP Report, for-profit colleges, including EDMC, systematically used improper and unlawful practices to consistently increase revenues through tuition and fees paid for by federal student aid.

62.     The unlawful practices included: misleading prospective students about tuition costs, academic program quality, accreditation, graduation rates, and post-graduation employment prospects and expected salaries; aggressively targeting low-income and vulnerable populations; using aggressive telephone marketing practices; engaging in improper practices in connection with students' and prospective students' financial aid forms; and improperly compensating admissions staff based on student enrollments.

### E.  The Qui Tam Actions and State Investigations

63.     On May 3, 2011, a qui tam action captioned *United States of America, and the States of California, Florida, Illinois, Indiana, Massachusetts, Minnesota, Montana, New Jersey, New Mexico, New York and Tennessee, and the District of Columbia, each ex rel., Lynntoya Washington and Michael T. Mahoney v. Education Management Corporation, et. al.* (the "Government qui tam Action"), filed under the federal False Claims Act in April 2007 in the

11

Case ID: 241101799

United States District Court for the Western District of Pennsylvania, was unsealed with Government intervention.

64. The Government qui tam Action alleged that the Companies' compensation plans for admission representatives violated the HEA and U.S. Department of Education ("DoE") regulations prohibiting an institution participating in Title IV programs from providing any commission, bonus or other incentive payment based directly or indirectly on success in securing enrollments to any person or entity engaged in any student recruitment or admissions activity during the period of July 1, 2003 through June 30, 2011.

65. In March 2012, a qui tam action captioned *United States of America, ex rel. Jason Sobek v. Education Management Corporation, et al.* (the "Sobek qui tam Action" and collectively with the Government qui tam Action, the "Qui tam Actions"), filed under the federal False Claims Act in the Western District of Pennsylvania in January 2010, was also unsealed.

66. In the Sobek qui tam Action, it was alleged that EDMC violated the U.S. Department of Education's regulation prohibiting institutions from making substantial misrepresentations to prospective students, did not adequately track student academic progress and violated the U.S Department of Education's prohibition on the payment of incentive compensation to admissions representatives.

67. State and local governments investigated EDMC as well. For example, in August 2011, EDMC received a subpoena from the Attorney General of the State of New York requesting documents and detailed information relating to the Company's compensation of admissions representatives and recruiting activities.

68. Ultimately, 38 states and the District of Columbia formed a consortium (the "Consumer Protection Consortium") for purposes of conducting investigations into EDMC's

12

Case ID: 241101799

potential violations of state consumer protection laws relating to the Company's recruiting activities, job placement efforts and other issues.

### F. Eligibility for Programs under Title IV of the Higher Education Act of 1965

69. For-profit universities rely on federal funding in the form of financial aid for their students.

70. Under Title IV of the HEA, Congress established various student loan and grant programs, including but not limited to, the Federal Pell Grant Program ("Pell"), the Federal Family Education Loan Program ("FFELP"), and the Federal Direct Loan Program ("FDLP") (collectively "Title IV funding") to financially assist eligible students in obtaining a post-secondary education.

71. Although the mechanism by which Title IV funding is disbursed to eligible students under the Title IV programs varies, each Title IV program requires compliance with specific conditions as a prerequisite to obtaining federal funds.

72. To become eligible to receive Title IV funding under programs such as Pell, FFELP, or FDLP, or to have its students receive Title IV funding, a post-secondary educational institution must first enter into a program participation agreement ("PPA") with the Department of Education ("DoE"). 20 U.S.C. § 1094(a); 34 C.F.R. §668.14.

73. Section 487 (a)(20) of Title IV, 20 U.S.C. § 1094(a)(20) explicitly requires that schools: "Will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance ...." 20 U.S.C. § 1094(a)(20) (the "Incentive Compensation Ban"). Title IV of the HEA expressly conditions the initial and continuing eligibility of schools to obtain Title IV funding on the requirement that the schools comply with the Incentive Compensation Ban.

13

Case ID: 241101799

74. In addition, state authorization and accreditation by an accrediting commission recognized by the Department of Education are also required for an institution to become and remain eligible to participate in Title IV programs.

75. If the Department of Education or another regulatory agency had determined that an institution improperly disbursed Title IV program funds or violated a provision of the HEA or the implementing regulations, that institution could be required to repay such funds to the DoE or the appropriate state agency or lender and could be assessed a substantial fine. Violations of Title IV program requirements could also subject EDMC to other civil and criminal penalties, including the limitation, suspension or termination of the participation of affected institutions in Title IV programs, and, thus, threatening its receipt of federal student aid funds.

G. **EDMC's Participation in Title IV Programs**

76. EDMC signed and submitted PPAs to the DoE on behalf of all of EDMC's educational institutions throughout the United States. After the original agreements expired, the President for each EDMC institution signed that institution's PPA agreement.

77. In each PPA, the Company certified that "[i]t will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA ...."

78. The Company further certified in each PPA that "[i]t will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance ...."

14

Case ID: 241101799

79.     In addition to the certifications made in the PPAs, the Company also made, or caused to be made, additional certifications as part of its annual compliance audits and as part of the student financial aid process.

80.     For example, as a required part of its annual compliance audits, the Company certified that it had complied with the requirements for eligibility to participate in Title IV programs, including the Incentive Compensation Ban.

81.     The Qui tam Actions alleged that EDMC knowingly made false statements, certifications, and claims regarding compliance with the Incentive Compensation Ban in order to become and remain eligible to receive Title IV funding.   According to the government's allegations, EDMC's statements were false when made, and caused the Department of Education to pay various claims under Title IV programs.

82.     From July 1, 2003 through June 30, 2011, EDMC received more than $11.1 billion in Title IV funding for students enrolled in EDMC institutions.  The Qui tam Actions focused on the alleged violations in connection with EDMC's receipt of these funds.

83.     The Title IV Funding received by EDMC increased rapidly, from $656 million in 2003-2004 to $2.578 billion in 2010-2011.

84.     EDMC continued to receive such funding throughout the time that the Qui tam Actions were pending.

**H.     "Gainful Employment" Regulations Substantially Impair the Financial Viability of EDMC's Ai Systems**

85.     Under the Obama administration, the for-profit post-secondary education industry faced heightened regulatory scrutiny.

86.     The DoE introduced Gainful Employment ("GE") regulations requiring programs at for-profit institutions to meet certain debt-to-earnings metrics for students enrolled in these

15

Case ID: 241101799

programs to be eligible for financial aid under Title IV.

87.     The final GE rule was published on October 31, 2014, and became effective on July 1, 2015. A program subject to GE regulations becomes ineligible for Title IV funding if its graduates failed to achieve the required post-employment debt-to-earnings metrics.

88.     As confirmed in a December 2, 2014 email from attorney Mike Goldstein, Co-Chair of the Higher Education practice of Cooley LLP ("Cooley"), EDMC retained Cooley to "prepare for the effectuation of Gainful Employment rules that would have a substantially negative effect on its Ai Schools." Cooley recommended a plan for the Company to divest its Ai Schools; the Company did not implement the plan.

89.     Based on the issuance of GE results by the DoE, ~59% of EDMC's core Ai students were enrolled in programs that received a failing result.

90.     While certain Argosy and South programs received failing results as well, these systems took preemptive steps to mitigate any future negative impact.

91.     Remedial actions were not undertaken by EDMC with respect to Ai programs and EDMC management determined that Ai would again receive a failing result and lose Title IV funding.

92.     With the loss of Title IV funding, students would no longer be able to rely on federal loans to pay for their education, significantly impacting enrollment—causing systemic negative ripple effect throughout Ai.[2]

93.     While GE devastated the financial viability of EDMC's Ai systems, it had little if any effect on the value of South and Argosy.

---

[2] On February 8, 2017, EDMC sent out letters warning its students of the implications associated with GE regulations.

Case ID: 241101799

**I. EDMC Undergoes an Out-of-Court Restructuring: Debt is Reduced; Company Lenders Acquire a 96% Equity Stake; the Board is Shuffled; and Private Equity Giant KKR—the Largest EDMC Shareholder—Appoints Two Board Members, Defendant Cook and EDMC Wrongdoer McEachen Who Becomes CEO**

94. In May 2014, investment bank Houlihan Lokey Capital, Inc. ("HL") was engaged to represent EDMC lenders and noteholders in a comprehensive out-of-court restructuring of EDMC. The debt restructuring—with phase one completed in September 2014 and phase two completed in April 2015—resulted in the KKR EDMC Shareholder/Lender Defendants becoming EDMC's largest equity holder and second largest debt holder.

95. No later than June 30, 2014, EDMC was insolvent, as liabilities exceeded assets by almost $300 million. The Company remained insolvent through the Petition Date.

96. The KKR EDMC Shareholder/Lender Defendants, acting by and through the KKR Entity Defendants, appointed two new EDMC directors as of January 15, 2015, Defendant Kermit Cook (a director of KKR Capstone, a global investment firm) and Mark A. McEachen ("McEachen").

97. McEachen became CEO on September 1, 2015, and the KKR appointees Cook and McEachen were tasked to liquidate the Company.

98. At all times material hereto, while serving as an Officer and Director of EDMC, McEachen also served as a director of KKR portfolio company Chembulk Tankers.

99. Eight directors on EDMC's 11-member board resigned, with KKR appointees Cook and McEachen then serving as two members of a three-member board.

100. Cook had a career steeped in the education space, thereby heightening his Title IV disqualification exposure from affiliating with another education system that accepted Title IV funds in the event Ai failed.

101. Thereafter, three more directors—Danielson, Jonathan D. Harber ("Harber") and

17

Case ID: 241101799

Jerome G. Kamer ("Kamer")—were appointed to the EDMC Board.

102.    Danielson had a career based in the education space and he had formerly served as an Undersecretary of Education.  Danielson's career path in education heightened his Title IV disqualification exposure (as hereinafter described) from affiliating with another education system that accepted Title IV funds in the event Ai failed.

103.    Harber similarly had a career based in the education space, which heightened his Title IV disqualification exposure from affiliating with another education system that accepted Title IV funds in the event Ai failed.

104.    Harber precipitously resigned from the EDMC Board on November 29, 2016, as director Title IV exposure took center stage.

105.    As of June 30, 2016, the KKR Entity Defendants, acting for and on behalf of the KKR EDMC Shareholder/Lender Defendants, controlled $67 million of outstanding Company debt, owned 12.4% of EDMC stock and was EDMC's largest equity holder.

106.    The KKR EDMC Shareholder/Lender Defendants status as EDMC's largest equity holder—and the KKR Entity Defendants and KKR EDMC Shareholder/Lender Defendants power to control two seats on EDMC's Board continued until the closing of the conflicted DCF Transaction (hereinafter described).

J.      **EDMC Settles the Qui tam Actions**

107.    On January 23, 2015, EDMC's counsel provided a settlement analysis and risk assessment, recommending that the Company settle the Qui tam Actions and state court consumer protection investigations.

108.    EDMC approved the settlement strategy. In November 2015, Debtors reached a settlement with the U.S. Department of Justice, 12 state attorneys general, the District of Columbia

18

Case ID: 241101799

and Relators resolving all known cases filed under federal and state False Claims Act (FCA) provisions. Concurrently, it settled the investigations by the Consumer Protection Consortium (collectively, the "2015 Settlements").

109. In connection with the 2015 Settlements, EDMC paid $95.5 million, to be distributed among the United States, the various states involved in the litigation, and the Relators.

110. The 2015 Settlements also resulted in Consent Judgments (the "Consent Judgments") entered in state courts for the states involved in the Consumer Protection Consortium that required certain reforms to the Defendants operations, and, *inter alia*, required the EDMC Companies to forgive $102.8 million in loans to certain students who attended the Company's institutions between January 1, 2006 and December 31, 2014.

**K. Defending the Qui tam Actions and Feigning Innocence, EDMC Secretly Planned To Liquidate its Businesses, and Hired HL to Effectuate the Process, Only to Have KKR, Cook and EDMC Wrongdoers—Motivated by Conflicted Loyalties to KKR and Personal Interests—Breach their Fiduciary Duties to EDMC When they Torpedoed Potential Sales Of South and Argosy for up to $150 Million and Sold the Schools to DCF for Less than Zero, While EDMC Wrongdoers Lined their Pockets with Bonuses**

**(i) Project Pluto—South and Argosy Have Buyers, Ai Does Not**

111. By January 2015, HL was acting as EDMC's financial advisor in connection with the potential sale of South, Ai, and Argosy, referred to internally as "Project Pluto."

112. Starting in Q4 CY 2015 through Q3 CY2016, in accordance with the Board's directives, Houlihan Lokey contacted 68 strategic and financial buyers on behalf of the Company to explore their potential interest in acquiring all of South, Argosy and/or Ai.

113. Initial indications of interest were received from seven parties for South and two parties for Argosy.

114. One of the Argosy bidders also submitted a bid for South.

19

Case ID: 241101799

115. No parties submitted an initial indication for all of Ai.

116. Defendant Cook led the process as early as March 2015.

117. By email dated April 13, 2015, Cook circulated the "Project Everest Board Presentation: Ai Teach-Out Recommendation" dated April 14, 2015 to Beekhuizen and others for presentation to the new Board, which recommended the "Teach Out"—meaning discontinuing new enrollments—at 15 campuses identified as underperforming financially and not-core to the Ai strategy, including 9 main campuses and 6 satellite campuses.

118. As confirmed in Cook's May 17, 2016 email, EDMC was favorably considering a sale of South and Argosy to National University ("National") for $150 million, with no mention or requirement that Ai be included:

**From:** Kermit Cook <Kermit.Cook@kkr.com>
**Sent:** Tuesday, May 17, 2016 9:21 PM EDT
**To:** McEachen, Mark A. <mmceachen@edmc.edu>; John Danielson <jdanielson@chartwellhamilton.com>; Jonathan Harber <jonathan.d.harber@gmail.com>; Jerry Kamer <jkamer@me.com>
**CC:** Rofel, Justin <JRofel@HL.com>; Jalufka, Frank <fjalufka@edmc.edu>; Earls, Trisha <tearls@edmc.edu>; Kramer, Devitt <devitt.kramer@edmc.edu>
**Subject:** RE: National

Mark,
Thanks for the summary on the approach going back. Quick thoughts:
- Diligence requests seem absolutely spot on. You need to be able to manage the team's time, this should be minimum expectation.
- Closing mid next year is crazy and I would see as untenable. It puts too much at risk to have that level of uncertainty on outcome – don't think strategically we could accept it. I would leave the reasonable expectations to Trisha and Justin who would have a better perspective on requirements, but we completed a complete restructuring with accreditor approval in much less time than that.
- On valuation, leave it to you and the team who are closer to the modeling on the right strategy at this point, but on the surface the $150M floor for both South + Argosy seems more than reasonable. Would be hard to see us getting comfortable below that.

Hope that helps. Good luck.

- Kermit

119. As McEachen's October 10, 2016 email makes clear, EDMC was prepared to sell South and Argosy to National—Ai was not part of the deal:

20

Case ID: 241101799

From: McEachen, Mark A. <mmceachen@edmc.edu>
Sent: Monday, October 10, 2016 8:21 PM EDT
To: John Danielson <jdanielson@chartwellhamilton.com>; Kramer, Devitt <devitt.kramer@edmc.edu>; Jalufka, Frank <fjalufka@edmc.edu>; W. Morgan Burns <morgan.burns@FaegreBD.com>; Chris Wilson <cwilson@hl.com>
CC: McEachen, Mark A. <mmceachen@edmc.edu>
Subject: Draft Note to MC

Mike

As promised, the Board considered your offer to acquire Argosy and South University and compared it to the other strategic choices we have and I am pleased to let you know that the Board would like to enter into a deal with National University but we must have a few slight changes to your IOI.

120.    On October 18, 2016, the EDMC Board—which then included Defendant Cooke, McEachen, Danielson, Harber and Kamer—along with EDMC officers Frank Jalufka ("Jalufka"), J. Devit Kramer, EDMC SVP, General Counsel and Secretary ("Kramer"), and others met at the offices of KKR in New York City.

121.    The EDMC Board received an update on Project Pluto from HL, which reported substantial progress in reaching an agreement to sell South and Argosy to National for $130 million, but no progress in finding a buyer for Ai.  As to South and Argosy, HL reported:

**South University and Argosy University**
- EDMC continues to work with National University towards an 11/10/2016 signing date
  - Anticipated to close in August 2017 (FY2018)
- Total consideration is expected to be $130MM, consisting of $95MM cash upfront at closing and a $35MM 2-year seller note
  - Purchase price reduction of ~$15MM for inactive AR, split proportionally between cash (73%) and seller note (27%) consideration
  - EDMC is also expected to absorb $7MM of severance expenses
  - Other details still under discussion

122.    At the time, there was no mention of including Ai in the sale to National, let-alone conditioning the sale of South and Argosy with a requirement that National purchase Ai.

    **(ii)**    **KKR Title IV Exposure for its Substantial Investment in Laureate and Officer/Director Exposure Under Title IV Take Center Stage and Hijack the <u>Sale Process</u>**

123.    At the October 18 EDMC Board meeting, EDMC outside counsel David Shapiro from Wachtell, Lipton, reviewed "the fiduciary obligations of directors under Pennsylvania corporate law in light of the Company's current financial situation and the inability to date to sell

21

Case ID: 241101799

one or more of the Company's education systems pursuant to Project Pluto. Mr. Shapiro also addressed the duties of directors to the Company's shareholders and debtholders."

124. Over the next few months, the sale process was hijacked by concerns of the impact that KKR's equity/debt investment in EDMC may have on KKR's substantial investment in Laureate that received Title IV funds and potential EDMC officer/director exposure given EDMC's substantial receipt of Title IV funds, in the event of a shut down or bankruptcy of EDMC's Ai businesses.

125. KKR owned a material equity stake in Laureate until at least 2022, when it sold more than $300 million of its equity in a public offering.

126. On November 8, 2016, the EDMC board met at KKR.

127. EDMC directors Defendant Cook, McEachen, Danielson, Harber and Kamer, along with EDMC officers Kramer, Jalufka and Mark E. Novad ("Novad"), EDMC's Senior VP of Human Resources attended.

128. At that meeting, McEachen made false statements about the ability to sell South and Argosy to National without including Ai in the deal and recommended that EDMC cease negotiations with National and pursue discussions with DCF.

129. Tellingly, however, the minutes of that meeting omit discussion of the conflicted considerations that ultimately hijacked the sale process—the impact on KKR's Laureate investment, and EDMC officer/director exposure under Title IV should Ai fail while Title IV funding remained outstanding.

130. The conflicted considerations discussed at the November 8 board meeting were omitted from sanitized board minutes.

Case ID: 241101799

131. They were disclosed, however, in a November 16, 2016 email from Wachtell Lipton attorney Joshua Feltman to EDMC General Counsel, Kramer:

> **From:** Feltman, Joshua A. [mailto:jafeltman@WLRK.com]
> **Sent:** Wednesday, November 16, 2016 9:43 AM
> **To:** Kramer, Devitt
> **Subject:** follow-up...
>
> Devitt,
>
> Followed up with Paul Weiss and their thought upon consultation with KKR is that a briefing with Hylden (they just referred to regulatory counsel; I'm assuming Tom) would make sense, covering the following general topics which were raised at the last board meeting:
>
> a) is there possibility for individual liability under Title IV and state-law analogs
>
> b) the directorship/control person disqualification questions arising from being a director/control person at an institution that fails to satisfy Title IV obligations
>
> In short: a session on some of the "Additional Risks and Considerations Under a Shut Down" that you flagged in the deck...
>
> Seems like a sensible idea to cut to the chase, avoid a game of telephone on some of the technical questions folks may have, etc. Whether just the KKR guys or whole board if want to join... Let me know...
>
> JF

132. A fulsome Title IV exposure analysis from EDMC education counsel Mike Goldstein of Cooley and heightened scrutiny from KKR and its counsel at Paul Weiss followed.

133. The urgency of the KKR conflict given its sizeable investment in Title IV dependent Laureate is highlighted by Kramer in his November 29, 2016 to Goldstein, which reports that KKR's counsel Paul Weiss was calling "every day":

> -----Original Message-----
> **From:** Kramer, Devitt [mailto:devitt.kramer@edmc.edu]
> **Sent:** Tuesday, November 29, 2016 1:30 PM
> **To:** Goldstein, Mike
> **Subject:** Director Resignations
>
> Mike,
>
> I really need the director advice we discussed because Paul Weiss is now calling daily on behalf of KKR. What's the status?
>
> J. Devitt Kramer
> SVP, General Counsel and Secretary
> Education Management Corporation

Case ID: 241101799

134.    Attorney Goldstein responded five hours later, and his legal assessment confirmed potential KKR Title IV exposure for its Laureate investment, and potential KKR, Cook and EDMC officer/director disqualification and personal liability exposure under Title IV.

135.    Specifically, Title IV and implementing regulations potentially exposed KKR, Cook and EDMC Wrongdoers to the following consequences in the event EDMC's Ai Schools closed or filed for bankruptcy while Title IV funds remained outstanding:

(a) As an owner or control person of an institution with unsatisfied Title IV liabilities, KKR was "tainted" and "disqualified" from being associated with another Title IV participating institution such as Laureate;

(b) As directors or officers of an institution with unsatisfied Title IV liabilities, Cook, McEachen and the other EDMC Wrongdoers were "tainted" and "disqualified" from being associated with another Title IV participating institution; and

(c) As directors or officers, or owner/control person in the case of KKR, of an institution with unsatisfied Title IV liabilities (i.e. EDMC), Cook, McEachen, the other EDMC Wrongdoers and KKR potentially were at personal risk for having to repay outstanding Title IV liabilities, especially in the case of fraud (such as the wrongdoing underlying the Qui tam Actions).

136.    Given KKR's status as EDMC's largest shareholder, KKR's appointment of two board members, and KKR's control over EDMC's strategic direction and sale process from the moment KKR designees Cook and McEachen joined EDMC's Board, KKR qualified as an owner and control person, with attendant Title IV exposure.

137.    Accordingly, the failure or bankruptcy of EDMC's Ai businesses would have jeopardized KKR's investment in Laureate and potentially exposed KKR to personal liability for EDMC's unsatisfied Title IV liabilities—a powerful motivation to ensure that EDMC rid itself of

24

Case ID: 241101799

its Ai business even if it must pay a buyer to take it, which is exactly what happened here.

138. The November 29 Goldstein email memo was shared with the EDMC Board and others, including Jalufka.

139. In an email on December 6, 2016, Cook raised follow up questions on the Cooley memo, clearly concerned that his position on the EDMC Board and KKR's shareholder/control person status in EDMC could have negative implications for him and KKR.

140. Cook's reference in the email that "our legal team has discussed this with Wachtell [EDMC's counsel]" makes clear that Cook is acting to protect KKR and himself, patently disregarding his fiduciary duty as an EDMC board member:

---

**From:** Kermit Cook [mailto:Kermit.Cook@kkr.com]
**Sent:** Tuesday, December 06, 2016 3:46 PM
**To:** Kramer, Devitt
**Cc:** McEachen, Mark A.; John Danielson; Jerry Kamer
**Subject:** RE: EDMC Board of Directors Meeting

Devitt –

Below are the follow up questions on the Cooley memo that I referenced. I think our legal team has discussed this with Wachtell. I've copied the rest of the board for reference. Let me know any questions.

Thanks,
Kermit

1. Are you aware of any instance in which a single director has been found to be an "affiliate or principal" of an institution for purposes of the Closed School Discharges statute and related regulations?
2. Do you have examples where "affiliates and their successors, its sureties, and any private fund" been found to include equity holders (and does the fact that a director was appointed by such equity holder matter)?
3. Does this analysis apply to former directors as well?
   a. Additionally, has resignation of a director been an act, by itself, resulting in liability?
4. What is the analysis for determining whether an individual is "exercising substantial control" over an institution?
   a. Are you aware of any instance in which a single director has been found to have exercised substantial control?
5. How does ED notify an individual or entity that they exercise or have exercised substantial control? Is there any process by which ED's determination can be challenged or appealed?
   a. Could you provide additional detail regarding the facts and circumstances of the officer that ED "hounded for years" mentioned in the email.
6. What constitutes a "liability for a violation of a Title IV, HEA program requirement"?
   a. Does any unpaid debt to ED constitute a liability "for a violation of a Title IV, HEA program requirement"?
7. Please explain further how the "Department could look to the bankruptcy voidable preference 90 day rule as a benchmark."
   a. Does this mean that decisions taken by the board within the 90 days following an individual's resignation from the board can be attributed to the individual that resigned? Or does it mean something else?
   b. Would this extend to a directors decision to resign.
8. Are there any similar state statutory or regulatory provisions that impose potential liability on directors or that would result in a director being disqualified from future service on the board of an institution which receives Title IV funding?
9. Have the recent bankruptcies of any Title IV institutions resulted in any substantial director liability in favor of the DOE or an equivalent state regulator?

---

141. As an HL email on January 5, 2017 confirms, Director affiliation with debt or equity holders—specifically Cook and KKR—was problematic:

25

From: Chayet, Casey <CChayet@HL.com>
Sent: Thursday, January 05, 2017 3:39 PM EST
To: Kramer, Devitt <devitt.kramer@edmc.edu>
CC: Striepe, Kevin <KStriepe@HL.com>; Najera, Tim <TNajera@HL.com>
Subject: BoD Affiliation With Debt or Equity Holders

Devitt,

We have received an inquiry from our HL legal team as whether or not any of the EDMC Board of Directors are affiliated with any of the debt or equity holders of EDMC.

We have taken a look and aside from Kermit J. Cook (Director at KKR Capstone), we have not been able to identify anyone else.

Board Members we have looked into:
-Kermit J. Cook (KKR)
-John M. Danielson (None)
-Mark A. McEachen (None)
-Jerome G. Kramer (None)

Can you please confirm that our list is thorough and that there are no other affiliations with Equity owners or Lenders?

Thanks,

**Casey Chayet**
Financial Analyst, TMT

HOULIHAN LOKEY

142. Personal interests, which conflicted with the interests of EDMC, motivated KKR and its proxies, including Cook, McEachen, Danielson, Kramer, Jalufka and Novad to push EDMC into a transaction that included the Ai systems, even if that resulted in reduced or no proceeds whatsoever to EDMC—the very result achieved from the sale of South, Argosy and Ai to DCF.

143. It is no coincidence that Cook precipitously resigned from the EDMC board on January 13, 2017—after joining with McEachen and others to rebuff potential sales to National and Cerberus that did not include Ai (as described below), instead steering EDMC into a worthless transaction with DCF that did.

144. The deal between EDMC and DCF was inked five days later.

(iii) **KKR, Cook and EDMC Wrongdoers Torpedo Potential Sales to South and Argosy for up to $150 Million, Opting Instead to Sell Ai, South and Argosy to DCF for Less than Nothing**

(a) **National University**

145. Two days after the November 8 EDMC board meeting discussing KKR exposure for its Laureate investment and potential officer/director exposure under Title IV from the closure or bankruptcy of EDMC's Ai businesses, McEachen pulled an eleventh-hour bait and switch on

26

Case ID: 241101799

National.

146.    Out of the blue, McEachen conditioned the sale of South and Argosy on National's purchase of EDMC's California Ai schools, as the November 10, 2016 email from National's Chancelor highlights:

From: Michael Cunningham <mcunningham@nu.edu>
Date: November 10, 2016 at 10:20:31 PM PST
To: "McEachen, Mark A." <mmceachen@edmc.edu>
Subject: RE: Update


Dear Mark,

Thank you for taking the time to meet with me today. Although I was taken by surprise by the new requirement to address the sale of the 6 AI California campuses, I fully understand your position and appreciate your candor.  With regard to our current transaction, I thought we made significant progress in understanding each other's positions and challenges. In order to consider the new transaction, I feel it is paramount to come to agreement on the existing transaction. If we can agree by close of business tomorrow on the terms and conditions of an IOI on the current transaction, we will continue negotiations on the 2nd transaction with the understanding that, as a condition of closing, the 6 Ais would be negotiated. If we do not have an agreement on the current transaction by tomorrow, we respectfully will withdraw our proposal at 5:01 PST tomorrow and no longer engage.  Accordingly, please find attached our markup of our last IOI which addresses many of your concerns which were addressed today.
Thank You,
Mike


Michael R. Cunningham, Ph.D.
Chancellor, National University System

147.    Days later, in an email dated November 13, 2016, National's investment banker advised HL that McEachen's insistence on including Ai in the deal was about to kill it.

148.     The next day, November 14, 2016, after almost a year of negotiations, National made its final, definitive offer to purchase Argosy and South for $130,000,000.

149.    After McEachen insisted that National include Ai in the deal, National walked away.

27

150. In his November 15, 2016 email to EDMC Director Danielson, National reported: "Every team member on our side of the table, from lawyers to investment bankers to key staff at the University are convinced that Mark [McEachen] did not negotiate in good faith."

151. In his November 16, 2016 letter to Danielson and McEachen, National's Chancellor made clear that the 11th hour demand to include Ai killed the deal:



**OFFICE OF THE CHANCELLOR**
of the National University System

11355 North Torrey Pines Road, La Jolla, CA 92037-1011

November 16, 2016

Education Management Corporation
210 Sixth Avenue, 33rd Floor
Pittsburgh, Pennsylvania 15222

Attn: Mark McEachen, CEO and President
Attn: John Danielson, Chairman

Dear Chairman Danielson and Mr. McEachen,

Over the past 11 months, our organizations have been working towards entering into an agreement which would lead to the integration of Argosy University (AU) and South University (SU) into the National University System. While we believe such a union would be in the best interest of all parties concerned, especially the current and future students of AU and SU, we have not been able to reach a satisfactory agreement.

Although we thought we were close to an agreement, your last minute demand that the six Art Institutes be part and parcel with this transaction is simply untenable to us. We have spent hundreds of thousands of dollars and thousands of man hours researching this transaction, as it was initially intended, only to have this new requirement emerge. Your unwillingness to proceed unless we address the Art Institutes is, in our view, unreasonable and not in line with our original understanding.

To say the least, we are disappointed and quite frankly shocked at your new position. We feel that we have negotiated in good faith, have been very responsive to your requests, and have found common ground on most issues. We were mindful of your desire for the surety of close and a timely signing and closure of a transaction. We assured you that the National University System was ready, willing and able to consummate this transaction as originally contemplated.

We find your new demands not in keeping with our original understanding and not in good faith. We therefore are withdrawing any offers previously submitted and will no longer engage in negotiations with EDMC, now or in the future. Accordingly, we will be notifying all previously contacted regulators and accreditors of our decision not to go forward. It is very unfortunate that it has come to this.

Sincerely,

Michael R. Cunningham, Ph.D.

Chancellor, National University System

28

Case ID: 241101799

**(b)    Cerberus**

152.    On November 22, 2016, private equity powerhouse Cerberus Capital Management, L.P. ("Cerberus") expressed interest in acquiring South and it entered into a confidentiality agreement with EDMC to facilitate a potential transaction.

153.    On November 28, 2016, HL updated McEachen as to its "preliminary productive call with Cerberus":

> Sent from my iPad
>
> On Nov 28, 2016, at 7:48 PM, Najera, Tim <TNajera@HL.com> wrote:
>
> Mark,
>
> Earlier today we had a productive preliminary call with Cerberus to discuss a number of opportunities w/r/t EDMC. While we did make it clear that it is our strong preference to do a single transaction with all three ed systems, based on our conversation, Cerberus indicated that based on its very preliminary review (they are still going through the materials), they are mostly interested in South and maybe Argosy. We are facilitating additional diligence requests to Cerberus to allow them evaluate the opportunity and did make it clear that they will need to move quickly as there are other interested parties in the process.
>
> To expedite the process, we have prepared the form LOI (attached) which we suggest sending along. For now, we have left each of the ed systems bracketed in the LOI.
>
> When you have a chance, please let us know if you are ok with us sending the attached form LOI to Cerberus.
>
> Please also let us know if you have any questions or would like to discuss.
>
> Best,
>
> **Tim Najera**
> Associate
>
> **HOULIHAN LOKEY**

154.    On December 13, 2016, Cerberus submitted to HL a proposal to acquire South for an amount between $125-150 million.

155.    At KKR Board designee McEachen's direction, the Company did not respond to Cerberus, as the December 13 email from HL confirms:

Case ID: 241101799

From: Striepe, Kevin [mailto:KStriepe@HL.com]
Sent: Tuesday, December 13, 2016 4:47 PM
To: McEachen, Mark A.
Cc: Kramer, Devitt; Jalufka, Frank; Wilson, Christopher; Najera, Tim; Chayet, Casey
Subject: Cerberus Proposal

Mark,

Please see the attached proposal we received from Cerberus. We will indicate to Cerberus that we are not in a position to respond at this time, but wanted to forward this to you for your records. Last time we spoke to them (prior to the LOI with DCF) we had indicated that we were very far down the road with another party, so they were aware that they are late to the game.

regards,

**Kevin Striepe**

**HOULIHAN LOKEY**

156. In its January 28, 2015 Project Pluto Update, HL valued South between $300 million and $325 million.

157. Rebuffing National's offer of $130 million for Argosy and South, and rebuffing Cerberus's opening offer of $125 - $150 million for South, EDMC, under the direction of KKR, Cook, McEachen and other EDMC Wrongdoers, sold South, Argosy and Ai to DCF in a transaction that returned nothing to EDMC, caused EDMC to come out-of-pocket to close the transaction and pay more than $20 million in bonuses, with KKR board designee McEachen alone receiving almost $14 million for having breached his fiduciary duties to EDMC for the benefit of KKR and himself.

        (c)    **DCF**

158. On November 17, 2016, DCF provided EDMC with a letter of intent to acquire the Ai core campuses, Argosy, and South for a total purchase price of $100 million, with a portion paid at closing and the balance over time, subject to working capital and other adjustments.

159. On January 18, 2017, EDMC and certain of its subsidiaries entered into an Asset Purchase Agreement (the "DCF Purchase Agreement") with Dream Center Foundation ("DCF"), a not for profit entity, and certain of its newly formed subsidiaries (collectively, "DCF") for the sale of substantially all of the Company's remaining school locations, specifically South

Case ID: 241101799

University, Argosy University, and the "core" Art Institutes school locations (other than The Art Institute of Vancouver) which were not being taught-out (the "DCF Transaction").

160. The DCF Purchase Agreement was amended and restated on February 24, 2017 and further amended on July 20, 2017 and October 13, 2017, which as described below produced no sale revenue to the Company and served only to protect the corporate interests of KKR and the personal interests of Cook and the EDMC Wrongdoers.

161. At the end of the day, EDMC received nothing, with the final amendment to the DCF Purchase Agreement reducing the purchase price to $25 million, which was wiped out by a working capital adjustment.

162. In mid-February 2017, DCF advised EDMC of its intent to terminate the Asset Purchase Agreement due to its inability to obtain financing.

163. McEachen renegotiated the terms of the DCF Transaction in a manner favorable to DCF, and substantially detrimental to EDMC and its stakeholders (other than KKR), reducing the purchase price from $100 million to $60 million (with $50 million due at closing, and two deferred payments of $5 million each due six and twelve months after closing).

164. In the summer of 2017, DCF's financing again failed to materialize, and as described below, McEachen and others provided false and misleading information to EDMC lenders, which induced them to consent to and finance the DCF Transaction.

165. By no later than September 7, 2017, however, DCF accused EDMC management—McEachen and Jalufka in particular—of withholding and providing false information that overstated enrollment data and accompanying financial metrics.

31

Case ID: 241101799

166. In his email dated September 24, 2017, DCF CFO James Terrell concludes that EDMC's Ai businesses were "in a death-spiral" and that there was no purchase price that "is feasible for this deal":

> Given the risk of not being able to fix this AiG death-spiral, I don't see how any purchase price is feasible for this deal. Maybe we can work out a deal where we pay some purchase price at closing so EDMC can pay the DOJ, but the EDMC lenders would pay us some of their EDMC cash collateral (of $100mm) when the DOE releases EDMC's LOC requirement if Ai does not meet a minimum EBITDA in FY18/FY19?

167. On September 25, 2017, representatives of DCF, including Brent Richardson, Randy Barton, and James Terrell had a meeting with Defendants McEachen and Jalufka and the Chancellors of Ai, Argosy and South.

168. The Chancellors walked through presentations on each of the school systems to affirm the EDMC projections. Following the presentation, the DCF representatives met with lender representatives, including Michael Lau, and they told the lender representatives that EDMC management was "playing with the numbers" and that DCF believed EBITDA was lower than what was being represented to DCF and lenders.

169. The meeting concluded with DCF's statement that the deal was dead, as DCF would not go forward with the transaction.

170. On September 26, 2017, lender's counsel was advised to stop working on the DCF Transaction as DCF believed FY 2018 projected performance will be much lower than forecasted by EDMC and requested a major price reduction.

171. On September 27, 2017, DCF's revised demands were presented to the EDMC Board—McEachen and Danielson, and Kamer—with Jalufka, Kramer and Mark Novad participating.

172. The EDMC Board directed management to reengage with DCF to complete the transaction.

32

173.    On the morning of September 28, 2017, Kramer advised counsel for the lenders that EDMC had reached a new deal with DCF—a deal which provided no economic benefit to EDMC and its non-KKR stakeholders.

174.    The new deal was approved by Directors McEachen, Danielson and Kamer at the EDMC Board meeting on October 13, 2017, and included (1) a purchase price reduction to $25 million, (2) a working capital adjustment which wiped out the purchase price and resulted in the Company receiving zero, (3) the Company having to come out-of-pocket to pay millions of dollars for lender fees and transition services provided by DCF to EDMC, and (4) the Company paying more than $20 million in bonuses to EDMC Wrongdoers.

175.    The DCF Transaction closed on October 17, 2017.

**L.    KKR Board Designee McEachen and Other EDMC Wrongdoers Mislead HL, Lenders and Other Stakeholders as to, Among Other Things, the Viability of the Cerberus and National Offers and, Along with KKR and Cook, Caused EDMC to Reject Them in Favor of an Inferior Deal with DCF Which Benefitted KKR, Cook and EDMC Wrongdoers**

176.    HL was troubled by McEachen's (and other's) direction to abandon the National transaction and rebuff the Cerberus offer in favor of a facially inferior offer from DCF.

177.    To protect itself, HL conditioned its fairness opinion provided in connection with the DCF Transaction on representations from McEachen and Jalufka as to the practical inability to sell South or Argosy apart from Ai—representations which were patently false.

178.    In this regard, HL associate Tim Najera, by email dated January 18, 2017 to McEachen and Jalufka writes:

33

Case ID: 241101799

From: Najera, Tim <TNajera@HL.com>
Sent: Wednesday, January 18, 2017 11:18 AM EST
To: Sussman, Lee <LSussman@hl.com>; McEachen, Mark A. <mmceachen@edmc.edu>; Jalufka, Frank <fjalufka@edmc.edu>
CC: Rosenberg, Robert <RRosenberg@HL.com>; Wilson, Christopher <CWilson@HL.com>; Salameh, Youmna <YSalameh@HL.com>; Striepe, Kevin <KStriepe@HL.com>
Subject: RE: Financial Information Confirmation
Attachment(s): "EDMC_Financial Information Confirmation_Redline.pdf","EDMC_Financial Information Confirmation (1.17.2017).doc"

Hi Mark,

Following up on Lee's e-mail below, can you please confirm by reply to this e-mail that we should use and rely on the information contained in the attached document for our analyses and opinion? For your convenience, I am reattaching the information confirmation and redline circulated last night.

Best,

**Tim Najera**
Associate

**HOULIHAN LOKEY**

179. HL's opinion letter of January 18, 2017 includes the following representations:

As you are aware, the management of EDMC has advised us that: (i) adverse market and regulatory dynamics for the post-secondary and for-profit education industries, declines in student enrollment and other industry and business trends have placed substantial pressure on the Business, and have contributed and are expected to continue to contribute to the deteriorating financial and operating performance of the Business; (ii) with respect to Core Ai, (a) certain programs of Core Ai affecting approximately 60% of students received a failing result under applicable rules and regulations of the U.S. Department of Education (the "DoE") in respect of "Gainful Employment" and those Core Ai programs will likely therefore become ineligible to participate in Title IV federal student financial aid programs ("Title IV programs"), which ineligibility and perception thereof is expected to have a material adverse financial effect on Core Ai, and, additionally, that certain Core Ai schools may become ineligible to participate in Title IV programs as a result of accreditation issues; (b) the management of EDMC believes that Core Ai will not be able to continue under the status quo as a going concern and that, as a result of certain structural (and related regulatory) constraints, a sale of South University and/or Argosy University could not be accomplished on a timely basis and a shutdown of Core Ai would cause the shutdown of South University and Argosy University; and (c) in light of these issues and constraints, the management of EDMC believes that consummation of a transaction involving South University and/or Argosy University without related Core Ai campuses is not feasible prior to the events anticipated by the management of EDMC relating to EDMC as described in clause (iii) below; and (iii) with respect to EDMC, the management of EDMC believes that in light of projected liquidity constraints, EDMC's accountants will likely issue an opinion in September 2017 raising substantial doubt as to EDMC's ability to continue as a going concern, thereby potentially causing a breach under certain of EDMC's bank covenants, the acceleration of the repayment of certain outstanding indebtedness of EDMC, which indebtedness EDMC would not be able to pay when due given the expected depletion by December 2017 (or potentially earlier in September 2017) of EDMC's available cash, and a requirement for an additional letter of credit from EDMC for regulatory purposes, and that these events would likely result in a voluntary or involuntary bankruptcy filing, liquidation or restructuring of EDMC and the Business as part of EDMC.

180. The representations as to the difficulty, cost or practical impossibility of separating and selling South and/or Argosy without including Ai, are patently false.

34

Case ID: 241101799

181. South and Argosy could have been separated and sold to National, and South could have been separated and sold to Cerberus for $150 million or more in a transaction that could have been consummated timely and which would have returned substantially more than the less than zero paid to EDMC from the sale to DCF.

182. At the Company board meeting on January 18, 2017, McEachen falsely represented that "a recently received … unsolicited offer from a third party for the purchase of South University … would have provided no value …."

183. As Defendant Cook, KKR board designee McEachen and the other EDMC Wrongdoers were or should have been aware, the opening $150 million offer from Cerberus—the "third party" offer to which he referred—was substantially better than the $100 million DCF offer for Ai, South, and Argosy which McEachen, Cook and other conflicted directors and officers trumpeted, an offer which deteriorated by $40 million in one month, and finally resulted in a sale to DCF for less than nothing when the DCF Transaction closed on October 17, 2017.

184. Despite this material reduction in the proposed purchase price under the DCF Transaction within a month of having received the Cerberus offer, EDMC, at the direction of McEachen and other EDMC Wrongdoers failed to reengage with Cerberus.

185. When EDMC agreed to a $40 million reduction in the purchase price of the DCF Transaction, HL was clearly uncomfortable with the Company's path, and it again requested representations which would disqualify separate transactions for the sale of South and Argosy— leaving the DCF Transaction, even with a $40 million reduced purchase price, the only option.

186. Accordingly, in its updated opinion letter dated February 24, 2017, HL relies on the same false representations as to South and Argosy to support a substantially lower purchase price for all three businesses, i.e., Ai, South and Argosy.

35

Case ID: 241101799

187.    The representations provided to HL in January and February 2017 were knowingly false and intentionally structured to eliminate a sale of South and Argosy separate from Ai and thereby disqualify the potential transactions with National and Cerberus, while justifying an inferior, conflicted transaction with DCF.

188.    In their effort to obtain lender consent and persuade lenders to finance DCF when its financing fell through for the second time in the Summer of 2017, McEachen and other EDMC Wrongdoers provided false and misleading information to lenders concerning, among other things: (1) lender's expected return from a sale to DCF as opposed to a liquidation; (2) consideration to be paid to lenders; and (3) arrangements in place to replace an existing letter of credit within six months of the closing.  The promised consideration was not paid, the letter of credit was not replaced, and the DoE eventually drew down on the letter of credit.

189.    History and timing further establish the falsity of McEachen's and other wrongdoers' representations and of their scheme to protect KKR, Cook and themselves at the expense of the Company and its creditors.

190.    The plan to separate Ai from South and Argosy was proposed in 2014, as EDMC management understood that GE regulations would have a substantially negative impact on the financial performance of EDMC's Ai businesses.

191.    With that understanding, EDMC engaged HL to sell South, Argosy, and Ai as a group or as standalone businesses, and they were marketed as such for more than a year.

192.    In numerous marketing presentations and other documents relating to the company's strategic alternatives, there is no prohibition as to selling South and Argosy separate from Ai and a recognition that GE regulations materially devaluing EDMC's Ai business supported separating Ai from more valuable South and Argosy to maximize the value of the

36

Case ID: 241101799

enterprise.

193.   It was only after KKR Board designees Cook and McEachen, KKR and other EDMC Wrongdoers learned of their potential Title IV liability or exposure in the event of a shutdown or bankruptcy of EDMC's Ai businesses that a scheme was hatched and implemented to falsely claim to HL, lenders and others that South and Argosy could not be sold separately from Ai.

194.   That falsity resulted in EDMC rejecting concrete opportunities to realize $150 million or more for the sale of South and Argosy, in favor of the sale of EDMC's entire enterprise to DCF for less than zero in a conflicted transaction where McEachen and other EDMC Wrongdoers pocketed more than $20 million for sacrificing EDMC and protecting KKR's Laureate investment and themselves.

**M.    While the Company Disintegrated, Certain EDMC Directors and Officers, Including KKR Board Designee McEachen Looted the Company on their Way Out the Door**

195.   While Debtors were on a death spiral from the damages flowing from the settlements of the Qui tam Actions and related state investigations, and the impending sale to DCF for what turned out to be less than zero, McEachen, Danielson, Jalufka, Kramer, and Novad lined their pockets and looted the Company of millions of dollars (collectively, the "Excessive Payments").

196.   Between January 15, 2016 and February 2, 2018, Debtors made bonus payments to McEachen in the amount of $13,741,064.27.

197.   Between August 4, 2017 and October 20, 2017, Debtors made bonus payments to Jalufka in the amount of $2,202,295.00.

198.   Between January 15, 2016 and October 20, 2017, Debtors made bonus payments to

37

Case ID: 241101799

Kramer in the amount of $2,391,402.00.

199.    Between August 4, 2017 and October 20, 2017, Debtors made bonus payments to Novad in the amount of $1,443,662.00.

200.    On October 20, 2017, Debtors made a bonus payment to Danielson in the amount of $965,000.00.

201.    As a direct and proximate result of the wrongdoing of the Defendants, as aforesaid, the Debtors have suffered damages in an amount which exceeds $170,000,000, and includes the damages caused by selling the Schools to DCF for less than nothing, while torpedoing potential sales to National and Cerberus for up to $150 million or more, and the Excessive Payments.

202.    The conduct of the Defendants as aforesaid was intentional, outrageous and sufficiently egregious as to warrant the imposition of punitive damages.

**N.    The Discovery Rule**

203.    Pursuant to a Transition Services Agreement executed in connection with the DCF Transaction, DCF took possession and control of substantially all the Company's and its affiliates' books and records and agreed to provide certain administrative services to the Company and its affiliates as they wound down business affairs.

204.    In connection with the 2017 sale to DCF, DCF acquired virtually all EDMC's then-existing documents and computer servers, which included potentially a petabyte (1,000 terabytes) of electronic data.

205.    To cover their tracks and protect the Defendants herein and themselves, EDMC Wrongdoers exported the evidence of their wrongdoing out of the possession and control of the Company and ultimately the Trustee, without having retained copies of this important electronic data.

206.    On January 18, 2019, DCF was placed into federal receivership in the United States District Court for the Northern District of Ohio.

Case ID: 241101799

207.    The Trustee made reasonable efforts to retrieve EDMC's books and records, including electronically stored information ("ESI"), from the DCF Receiver.

208.    The Trustee's counsel interacted with the DCF Receiver's e-discovery vendor and was provided with an index—i.e., a file tree of electronic documents—which spanned 4,400 pages.

209.    The DCF Receiver refused to make the Debtor's books and records available, necessitating the service of a subpoena from the Bankruptcy Court, and cite visits to the Receiver's offices in Cleveland, Ohio in December 2023, January 2024 and March 2024.

210.    The Trustee did not receive the EDMC documents that had been transferred to DCF and collected from the DCF Receiver until April of 2024, and it took months to review them.

211.    Until he recently received and reviewed the EDMC documents produced by the DCF Receiver, the Trustee did not discover, and reasonably could not have discovered the wrongdoing surrounding the sale of the Schools to DCF and the Excessive Compensation associated therewith—i.e., the conflicted sale to DCF for less than nothing, while torpedoing the opportunity to sell South and Argosy for up to $150 million or more—to protect KKR, Cook and EDMC Wrongdoers at the expense of the Company and its creditors.

212.    The *Qui Tam* Litigation involved several years of discovery, including production of more than 33 million documents to the government which the Trustee diligently collected and reviewed.

213.    The Trustee obtained more than sixty hard drives that are believed to include the 33 million documents produced by EDMC in the *Qui Tam* Litigation.  Some of the hard drives are encrypted and others are corrupted.

214.    Given the transfer of EDMC documents to DCF by EDMC Wrongdoers to protect themselves and Defendants KKR and Cook, along with the sheer volume of documents that needed

Case ID: 241101799

to be recovered and reviewed, the discovery rule tolled the statutes of limitations as to the Trustee's claims.

### O.    Fraudulent Concealment

215.    Acting for and on behalf of the Defendants, KKR board designee McEachen and EDMC Wrongdoers, Kramer, Danielson, Jalufka and Novad fraudulently concealed the wrongdoing in connection with the winddown of the Company and the sale of the Schools to DCF, which tolled the running of the statutes of limitations with respect thereto until the Trustee received and reviewed the EDMC documents recently produced by the DCF Receiver.

216.    Kramer, Senior Vice President, General Counsel and Secretary kept the minutes of the meetings of the EDMC Board (the "Board Minutes").

217.    To conceal the wrongdoing in connection with the winddown of the Company and the sale of the Schools to DCF, Defendant Kramer sanitized the Board Minutes to disguise the true circumstances and motivation underlying the decision to sell the Schools to DCF for less than nothing, while torpedoing the opportunity to sell South and Argosy for up to $150 million or more—that is to protect KKR, Cook and EDMC Wrongdoers at the expense of the Company and its creditors.

218.    While Defendant Kramer kept the minutes, KKR Board designees McEachen and Defendant Cook attended the meetings, knew the actual discussions at these meetings and knew that the Board Minutes had been sanitized to conceal the wrongdoing only recently discovered by the Trustee.

219.    Additionally, McEachen, with the knowledge and acquiescence of Defendant Cook before he resigned, KKR and the EDMC Wrongdoers, provided false information at the Board Meetings, misled HL and misled EDMC lenders to disguise the true circumstances and motivation

40

Case ID: 241101799

underlying the decision to torpedo potential sales of South and Argosy to National or Cerberus for

up to $150 million or more and to instead sell the Schools to DCF for less than nothing.

220.    The false information provided by McEachen at Board meetings included:

- Falsely representing that a sale to DCF was in the Company's best interests, when in fact it was substantially inferior to offers received from National and Cerberus, and was promoted to surreptitiously protect KKR, Cook and EDMC Wrongdoers at the expense of the Company and its creditors;

- Concealing the true motivation for terminating the negotiations with National and rebuffing the offer from Cerberus; and,

- False and misleading representations as to the inability to sell Argosy and South separate from Ai to secure rigged fairness opinions from HL to justify inferior, conflicted transaction with DCF.

221.    Kramer, with the knowledge and acquiescence McEachen and Defendant Cook

(before he resigned) doctored the Board Minutes to conceal the wrongdoing in connection with

the winddown of the Company, the sale of the Schools to DCF and the payment of the Excessive

Compensation, in at least the following respects:

- The EDMC Board Minutes from the meeting on November 8, 2016 omit the discussion as to shareholder, director and officer exposure under Title IV in the event of the shutdown or bankruptcy of Ai while Title IV Funds remained outstanding;

- The EDMC Board Minutes from the meeting on November 8, 2016 intentionally misstate the viability of a sale to National or of a sale that did not include Ai to promote a conflicted and inferior sale to DCF;

- The EDMC Board Minutes from the meeting on November 22, 2016 intentionally misstate the reason for the termination of negotiations with National; negotiations were not terminated because of National's "continued attempts to renegotiate terms previously agreed to by the parties," as the minutes falsely state. Rather, negotiations with National were terminated because National refused to include Ai in the deal, and Defendant Cook and the EDMC Wrongdoers chose surreptitiously to protect KKR as they promoted a conflicted and inferior sale to DCF;
- The EDMC Board Minutes from the meeting on January 18, 2017 falsely describe the recently received Cerberus offer as "an unsolicited offer from a third party for the purchase of South University which [in McEachen's view] would have provided no value to the Company …". The Cerberus offer was superior to the DCF

41

Transaction but was misdescribed and rebuffed because it did not include Ai. Defendant Cook and the EDMC Wrongdoers agreed surreptitiously to protect KKR and promote a conflicted and inferior sale to DCF;

- The EDMC Board Minutes from the meeting on January 18, 2017 falsely describe and materially misstate the fairness opinion from HL, which—as Cook, McEachen and the EDMC Wrongdoers were well aware—had been rigged to surreptitiously protect KKR, Cook and EDMC Wrongdoers and promote a conflicted and inferior sale to DCF;

- The EDMC Board Minutes from the meeting on February 18, 2017 falsely describe a materially reduced price from DCF as appropriate and in the Company's best interest and conceal that the revised HL fairness opinion had again been rigged to surreptitiously protect KKR, Cook and EDMC Wrongdoers and promote a conflicted and inferior sale to DCF;

- The EDMC Board Minutes from the meeting on October 13, 2017 (taken by Novad) falsely justify the propriety of another substantial price reduction—which resulted in the Company receiving less than zero and having to come out of pocket for millions of dollars for the sale of the Schools to DCF. The minutes are false and misleading as they justify moving forward with the DCF Transaction given "the absence of alterative transactions and the lack of other parties expressing interest in the Company's assets"—statements which were patently false and knowingly so. The minutes further conceal that the sale to DCF had been rigged to promote an inferior conflicted sale to DCF to surreptitiously protect KKR, Cook and EDMC Wrongdoers.

222. Accordingly, the doctrine of fraudulent concealment tolled the statutes of limitations as to the Trustee's claims.

## IV. CAUSES OF ACTION

### COUNT I – BREACH OF FIDUCIARY DUTY

223. Paragraphs 1 through 222 above are incorporated herein by reference, as if restated in their entirety.

224. As shareholders and lenders who controlled two Company Board seats and who controlled the strategic direction of the Debtors, including the wind-down and sale of the Schools, the Defendants owed fiduciary duties of loyalty and care to the Debtors.

42

Case ID: 241101799

225. As a director of EDMC, Defendant Cook owed fiduciary duties of loyalty and care to the Debtors.

226. The duty of loyalty obligates corporate fiduciaries to commit themselves to the business of the corporation with the attitude of promoting the interests of the corporation and not themselves.

227. The duty of loyalty is breached, *inter alia*: (1) when fiduciaries fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities; (2) fiduciaries act in their self-interest and contrary to the interests of their principal; (3) when fiduciaries "abdicate" their responsibilities; and/or (4) when fiduciaries fail to act in good faith.

228. The law does not charter law breakers. It permits entities to make a profit, but only when pursuing lawful business by lawful acts.

229. Accordingly, fiduciaries breach their duty of loyalty when they are conflicted and prefer themselves or their proxies such as KKR, at the expense of the Company and its creditors.

230. The duty of care is breached, *inter alia*, (1) when fiduciaries engage in an irrational decision-making process and/or (2) when the conduct of fiduciaries rises to "gross negligence."

231. By selling the Schools to DCF for less than zero to protect KKR and themselves, at the expense of the Company and its creditors, Defendants breached their duties of loyalty and care.

232. By facilitating the payment of the Excessive Compensation to EDMC Wrongdoers in connection with the sale to DCF for less than zero to protect KKR, at the expense of the Company and its creditors, Defendants breached their duties of loyalty and care.

233. Defendants' conduct, which resulted in the conflicted sale of the Schools to DCF for less than nothing, when South and Argosy alone were worth and could have been sold for $150 million or more, was not a good faith exercise of prudent business judgment because, among other

43

Case ID: 241101799

things, Defendants (a) acted to promote their self-interests and in bad faith, (b) had knowledge of improprieties that they encouraged rather than terminated, and (c) behaved in a manner that was reckless and egregious.

234. As a result of Defendants' breach of fiduciary duties, the Debtors suffered substantial damages for which the Defendants are jointly and severally liable.

## COUNT II – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

235. Paragraphs 1 through 234 above are incorporated herein by reference, as if restated in their entirety.

236. The KKR Entity Defendants and the KKR EDMC Shareholder/Lender Defendants knew of, encouraged and substantially assisted Defendant Cook and EDMC Wrongdoers McEachen, Danielson, Jalufka, Kramer and Novad in breaching their fiduciary duties to the Company.

237. Defendant Cook knew of, encouraged and substantially assisted EDMC Wrongdoers McEachen, Danielson, Jalufka, Kramer and Novad in breaching their fiduciary duties to the Company.

238. The KKR Entity Defendants and Defendant Cook are jointly and severally liable for aiding and abetting the breach of fiduciary duty by others.

## COUNT III – CIVIL CONSPIRACY

239. Paragraphs 1 through 238 above are incorporated herein by reference, as if restated in their entirety.

240. The Defendants conspired with each other, and with EDMC Wrongdoers McEachen, Danielson, Jalufka, Kramer and Novad to perpetrate, facilitate, and perpetuate the breaches of fiduciary duty alleged herein.

Case ID: 241101799

241. The Defendants undertook substantial overt acts, as aforesaid, in furtherance of the conspiracies alleged herein and are liable for the damages and harm to the Debtors.

242. As a result of the conspiracy among the Defendants, the Debtors suffered substantial damages for which the Defendants are jointly and severally liable.

## V. RELIEF REQUESTED

WHEREFORE, Plaintiff, George L. Miller, Chapter 7 Trustee for the jointly administered estates of the Debtors, demands judgment in his favor and against the Defendants, as follows:

(a) The entry of a judgment in favor of Plaintiff and against the Defendants, jointly and severally, for compensatory damages in an amount exceeding $50,000.00.

(b) The entry of judgment in favor of the Trustee and against the Defendants, jointly and severally, for punitive damages;

(c) Reasonable attorneys' fees and costs; and,

(d) Such additional relief as this Court deems just.

## VI. JURY DEMAND

The Trustee demands a jury trial in connection with all claims made herein.

Dated: December 20, 2024                    Respectfully submitted,


**COREN & RESS, P.C.**

/s/ Steven M. Coren

_____

Steven M. Coren, Esquire
John W. Morris, Esquire
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
(215) 735-8700

Counsel for Plaintiff George L. Miller, Chapter 7 Trustee

45

## VERIFICATION

I, George L. Miller, in my capacity as the Chapter 7 Trustee for the jointly administered bankruptcy estates of the debtors referenced in the forgoing Complaint, hereby certify that the averments of fact contained the forgoing Complaint are true and correct to the best of my knowledge, information, and belief. This verification is made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsifications to authorities.

Dated: December 20, 2024

GEORGE L. MILLER,
in his capacity as Chapter 7 Trustee

Case ID: 241101799

## CERTIFICATE OF COMPLIANCE

STEVEN M. COREN, ESQUIRE certifies that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that requires the filing of confidential information and documents differently than non-confidential information and documents.

/s/ Steven M. Coren
**Steven M. Coren**

Case ID: 241101799

**COREN & RESS, P.C.**
By:    **Steven M. Coren, Esquire**
        **John W. Morris, Esquire**
**Two Commerce Square, Suite 3900**
**2001 Market Street**
**Philadelphia, PA 19103**                     **Attorneys for Plaintiff**
**PA. I.D. Nos.: 32140; 4125**
**Phone: (215) 735-8700**

| | |
|---|---|
| GEORGE L. MILLER, Chapter 7 Trustee for Education Management Corporation (A Pennsylvania Corporation) 1628 John F Kennedy Blvd, #950 Philadelphia, PA 19103 | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| *Plaintiff,* | NOVEMBER TERM 2024 |
| *v.* | Civil Action No. 241101799 |
| KKR & CO. INC. 30 Hudson Yards, Ste. 7500 New York, NY 10001, *et al.,* | JURY TRIAL DEMANDED |
| *Defendants.* | |

## CERTIFICATE OF SERVICE

I, Steven M. Coren, Esquire, do hereby certify that I caused a true and correct copy of the

foregoing Complaint to be served on December 20, 2024, upon the following:

### VIA FIRST-CLASS MAIL:

FS KKR CAPITAL CORP.
F/K/A CORP. CAPITAL TRUST, INC.
201 Rouse Blvd
Philadelphia, PA 19112-1902

KKR FINANCIAL CLO 2007-1, LTD.
555 California Street, 50th Floor
San Francisco, CA 94104

MARYLAND STATE RETIREMENT AND
PENSION SYSTEM
120 East Baltimore Street
Baltimore, MD 21202

OREGON PUBLIC EMPLOYEES
RETIREMENT FUND
11410 Sw 68th Parkway
Tigard, OR 97223

Case ID: 241101799

BCBSM, INC.
3400 Yankee Dr.
Eagan, MN, 55121-1627

KKR FINANCIAL HOLDINGS III, LLC
555 California Street, 50th Floor
San Francisco, CA 94104

**VIA CERTIFIED MAIL:**

KKR CORPORATE CREDIT PARTNERS
L.P.
30 HUDSON YARDS, STE. 7500
NEW YORK, NY 10001

KKR CREDIT RELATIVE VALUE
MASTER FUND L.P.
30 Hudson Yards, Ste. 7500
New York, NY 1000

KKR FINANCIAL CLO 2005-1, LTD.
555 California Street
San Francisco, CA 94104

KKR FINANCIAL CLO 2005-2, LTD.
555 California Street, 50th Floor
San Francisco, CA 94104

8 CAPITAL PARTNERS L.P.
30 Hudson Yards, Ste. 7500
New York, NY 10001

KKR FINANCIAL CLO 2011-1, LTD.
555 California Street, 50th Floor
San Francisco, CA 94104

KKR FLOATING RATE FUND L.P.
30 Hudson Yards, Ste. 7500
New York, NY 10001

KKR-MILTON CAPITAL
PARTNERS L.P.
555 California Street, 50th Floor
San Francisco, CA 94104

KKR DEBT INVESTORS II (2006)
(IRELAND) L.P.
30 Hudson Yards, Ste. 7500
New York, NY 10001

KKR STRATEGIC CAPITAL
INSTITUTIONAL FUND, LTD.
555 California Street, 50th Floor
San Francisco, CA 94104

KKR FINANCIAL CLO 2006-1, LTD.
555 California Street, 50th Floor
San Francisco, CA 94104

SPRUCE INVESTORS LIMITED
30 Hudson Yards, Ste. 7500
New York, NY 10001

KKR & CO. INC.
C/O MAPLES FIDUCIARY SERVICES
(DELAWARE) INC.
4001 Kennett Pike, Suite 302
Wilmington, DE 19807

KKR & CO., INC.
30 Hudson Yards, Ste. 7500
New York, NY 10001

2

Case ID: 241101799

KKR & CO. LP
C/O MAPLES FIDUCIARY SERVICES
(DELAWARE) INC.
4001 Kennett Pike, Suite 302
Wilmington, DE 19807

KKR-PBPR CAPITAL PARTNERS L.P.
C/O MAPLES FIDUCIARY SERVICES
(DELAWARE) INC.
4001 Kennett Pike, Suite 302
Wilmington, DE 19807

KKR LENDING PARTNERS L.P.
C/O MAPLES FIDUCIARY SERVICES
(DELAWARE) INC.
4001 Kennett Pike, Suite 302
Wilmington, DE 19807

KKR CREDIT ADVISORS (US) LLC
C/O MAPLES FIDUCIARY SERVICES
(DELAWARE) INC.
4001 Kennett Pike, Suite 302
Wilmington, DE 19807

KERMIT COOK
41 Hancock Lane
Darien, CT 06820-2511

KKR & CO. L.P.
30 Hudson Yards, Ste. 7500
New York, NY 10001

KKR-PBPR CAPITAL PARTNERS L.P.
30 Hudson Yards, Ste. 7500
New York, NY 10001

KKR LENDING PARTNERS L.P.
30 Hudson Yards, Ste. 7500
New York, NY 10001

KKR CREDIT ADVISORS (US) LLC
555 California Street, 50th Floor
San Francisco, CA 94104

US INCOME STRATEGY FUND
30 Hudson Yards, Ste. 7500
New York, NY 10001

**COREN & RESS, P.C.**

Dated: December 20, 2024

*/s/ Steven M. Coren*
Steven M. Coren
John W. Morris
COREN & RESS, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
scoren@kcr-law.com
jmorris@kcr-law.com

*Attorneys for Plaintiff*

3

Case ID: 241101799